[Civ. No. 48201. First Dist., Div. Two. July 9, 1982.]

In re the Marriage of MARLENE and WILLIAM H. CLEMENTS.
WILLIAM H. CLEMENTS, Respondent, v.
MARLENE CLEMENTS, Appellant.

738

**COUNSEL**

Walter H. Medak for Appellant.

Merrill, Thiessen & Gagen and Brian D. Thiessen for Respondent.

**OPINION**

**MILLER, J.**—In this case we examine the discharge of a debt by the federal bankruptcy court when the bankrupt spouse was required to

make payments on the discharged obligation as part of a property settlement agreement ordered by a state family law court. The precise question presented by this appeal is whether the court below erred in reducing the bankrupt spouse's monthly support to reflect payments ultimately made on the discharged obligation by the nonbankrupt spouse who remained personally liable on the community debt. We conclude that no error was made.

William and Marlene Clements were married in 1955. Their marriage was dissolved by interlocutory decree on December 17, 1975. No appeal was taken from the interlocutory decree and a final judgment of dissolution was entered.

In the interlocutory judgment of dissolution, the trial judge made an equal division of community assets and community indebtedness. Among the community debts were obligations to C.I.T. Financial in the sum of $10,411 and Bank of America in the sum of $2,671. These were awarded to Marlene as her sole and separate obligations, and she was ordered to hold William free and harmless from any liabilities incurred with respect to these debts. Pursuant to this decree, Marlene was granted spousal support in the amount of $1,000 per month and William was obligated to pay $300 per month for support of two minor children awarded to Marlene's custody. Various community assets were ordered sold and the proceeds divided equally between the parties, including a limited partnership interest in Park Hall Investment.

After the dissolution, Marlene ran into financial difficulties and failed to make payments on the C.I.T. Financial obligation. Likewise, she fell in arrears on the Bank of America debt. The situation worsened and on July 25, 1977, Marlene was adjudicated a bankrupt by the United States District Court for the Northern District of California. The schedules submitted in connection with the bankruptcy listed the balances owed to C.I.T. Financial and Bank of America among the obligations sought to be discharged.

When C.I.T. Financial and Bank of America became aware of the futility of seeking payment from Marlene, William became exposed to creditor action based on his own personal liability for these debts.[1] Bank of America began making inquiry about payment and C.I.T. Financial

---

[1] The fact that Marlene was ordered to pay the obligations to C.I.T. Financial and Bank of America as part of the property settlement did not affect the creditors' independent rights against William. (Civ. Code, § 4358.) Furthermore, the Bankruptcy Act provides that the liability of a codebtor of the bankrupt is not discharged by the bankrupt's discharge. (11 U.S.C. § 524(e).)

was threatening legal action. To protect his credit standing, William began paying the obligation to C.I.T. Financial in the sum of $253 per month.

Because this debt had been assigned to Marlene as part of the equal division of community property, on February 9, 1978, William obtained an order from the trial court allowing him to reduce Marlene's spousal support in direct proportion to the payments he was making to C.I.T. Financial. Marlene's spousal support payments of $1,000 per month were accordingly reduced to $747.

The very next month, this matter was again before the court. In early February of 1978 the last community asset, the interest in Park Hall Investment, was liquidated and William and Marlene received a check representing their interest in the amount of $14,650. Marlene received a check representing her half of $7,325 in accordance with the terms of the dissolution. She quickly spent $1,325 on living expenses. William immediately sought and obtained a temporary restraining order from the trial court restraining Marlene from alienating the remaining $6,000 pending a hearing on his request that Marlene satisfy the balances owed C.I.T. Financial and Bank of America from the money received from the disposal of this community asset.[2]

A hearing was held on this request before the trial court on May 5, 1978. William emphasized that the balance still owing to C.I.T. Financial and Bank of America amounted to almost $6,000 and could be completely satisfied out of Marlene's share of the Park Hall Investment funds thereby freeing him of further liability to those creditors. Marlene stressed that her obligation to Bank of America and C.I.T. Financial had been discharged in the bankruptcy proceeding and any order requiring her to satisfy these obligations would circumvent the intent of the federal bankruptcy law.

Reasoning "that it would be a very artificial instruction of the law if I were to say that Mrs. Clements's discharge in bankruptcy prevents this Court under this set of facts from carrying out the interlocutory and the final judgment of dissolution of divorce," the court ordered Marlene to pay the outstanding balances to C.I.T. Financial and Bank of America out of the $6,000 remaining from the disposal of the community interest in Park Hall Investment. The temporary restraining

---

[2]When Marlene filed her bankruptcy action, she did not list the money receivable from Park Hall Investment as a prospective asset, nor did she inform the trustee of its receipt.

order enjoining Marlene from alienating any portion of the $6,000 was continued in full force and effect until the court was satisfied that Marlene had made the required payments.

On May 11, 1978, six days after the trial court had resolved the matter, Marlene obtained an ex parte order from the bankruptcy court dissolving the trial court's restraining order restricting her from spending these funds. This ex parte order was issued in a routine fashion ostensibly to hold matters in the status quo until a formal hearing could be held on the validity of the trial court's order requiring Marlene to satisfy these discharged obligations. On the strength of the bankruptcy court's dissolution of the restraining order, Marlene spent $5,237 of the $6,000 remaining from the Park Hall Investment funds in less than two weeks. Marlene's disbursement of these funds automatically reinstated the spousal support payment arrangement previously sanctioned by the trial court. The trial court's order included the provision that William would be permitted to continue offsetting any payment made to C.I.T. Financial against Marlene's support payments until the trial court was provided proof that Marlene had finally satisfied this obligation.[3] This appeal followed. The central question before us is whether the family law court erred in considering the obligations discharged in bankruptcy in establishing an adequate amount of spousal support.

The Bankruptcy Act as amended in 1978 (11 U.S.C. § 523(a)(5)) and its predecessor (11 U.S.C. § 35(a)(7))[4] provide that a discharge in bankruptcy shall release a bankrupt from all provable debts except debts due "to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child . . . ." ■ An order in a decree of dissolution that a spouse pay certain community debts may be either in the nature of alimony or support, not discharge-

---

[3]On May 22, 1978, the bankruptcy court held a formal hearing on Marlene's assertion that the trial court had impermissibly enforced the collection of discharged obligations. It was at this hearing that the bankruptcy court learned for the first time the true nature and purpose of the trial court's dissolved order restraining Marlene from disbursing the $6,000 she had held as half the distribution of community property. The bankruptcy court held that it was without jurisdiction to invalidate the trial court's order modifying support as this was the exclusive province of the state family law court. The bankruptcy court thereupon reinstated the trial court's order allowing William to deduct any payments made on the C.I.T. obligation from Marlene's support.

[4]In 1978, Congress repealed the Bankruptcy Act, effective October 1, 1979. However, a case commenced under the Bankruptcy Act continues to be governed by it. (See Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, § 403(a), 92 Stat. 2683.) The discharge provisions concerning alimony and support were unaffected by the revision.

able in bankruptcy, or in the nature of a property settlement, which is dischargeable in bankruptcy under present law. (*Goggans* v. *Osborn* (9th Cir. 1956) 237 F.2d 186, 189; *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 85 [154 Cal.Rptr. 413, 592 P.2d 1165]; *Yarus* v. *Yarus* (1960) 178 Cal.App.2d 190, 202 [3 Cal.Rptr. 50].) An agreement to hold a former spouse harmless on joint debts, such as the one involved in these proceedings, can also fall into either category. (See H. R. No. 95-595, 95th Cong., 1st Sess. (1977) p. 364.)

For purposes of determining if a debt is imposed to discharge the state law duty of support and maintenance or as part of a property settlement agreement, a court may look behind the label given by the parties to payments owing and ascertain the true nature of the obligation. (*Sloan* v. *Mitchell* (1972) 28 Cal.App.3d 47, 51 [104 Cal.Rptr. 418]; *Aarons* v. *Brasch* (1964) 229 Cal.App.2d 197, 202 [40 Cal.Rptr. 153]; *Carlton* v. *Superior Court* (1966) 240 Cal.App.2d 586, 588 [49 Cal.Rptr. 759].)

There is no serious claim that the debts assigned to Marlene by the family law court arose from a legal duty of alimony, maintenance or support for William or the minor child awarded to his custody. A cursory examination of the circumstances of the parties during the marriage reveals that William, a dentist, provided a healthy income for the family while Marlene engaged in caring for the home and the three children. Since the dissolution, Marlene has experienced extreme difficulty in generating enough income to meet her basic financial needs. In contrast, William's annual income for the years 1975 and 1976 was estimated at $80,000.

It is evident that the debts assigned to Marlene and the agreement to hold William harmless on these obligations were in settlement of property rights and were effectively discharged by her bankruptcy. At issue is whether this discharge prevents the state court from decreasing Marlene's spousal support payment to compensate William for assuming responsibility for these discharged obligations.

In resolving this controversy, we cannot fail to recognize that this court is faced with two competing policy considerations. Through discharge, the bankruptcy court attempts to provide "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." (*Local Loan Co.* v. *Hunt* (1934) 292 U.S. 234, 244 [78 L.Ed. 1230, 1235, 54 S.Ct. 695, 93 A.L.R. 195].) On the other hand, the family law court has a strong interest in

requiring the bankrupt to fulfill obligations that are an indivisible part of the equal division of community property. These policies have collided in two recent cases. While not providing a concise solution to the dispute before us, these cases are instructive in clarifying the considerations we face.

In *Matter of Paderewski* (9th Cir. 1977) 564 F.2d 1353, a trustee in bankruptcy claimed title to half interest in a community property residence. The interlocutory decree, which had become final, had not awarded each party a half interest in the residence. The family law court had ordered that the first trust deed, taxes, costs of sale, $15,000 worth of community debts and the attorneys' fees for the parties were to be paid out of the gross proceeds before any division was made. The federal court of appeals declared that the bankrupt's interest in the property was fixed and limited by the divorce decree; and since the bankrupt did not have a half interest in the property at issue, neither did the trustee.

In the instant case the interlocutory decree made no provision for the payment of these debts out of the proceeds of the sale of the property. There was no specific fund which the divorce decree ordered to be set aside for the payment of these community debts. Rather, these debts were simply assigned to Marlene for payment as part of the property settlement arrangement. And, as has been discussed, the Bankruptcy Act relieves the obligor of any legal duty to pay a debt imposed by a family law court as part of a property settlement agreement.

The factual similarity of *In re Marriage of Cohen* (1980) 105 Cal. App.3d 836 [164 Cal.Rptr. 672] is more compelling. After the separation of the parties but before the dissolution, the husband obtained a discharge in bankruptcy listing several obligations jointly incurred. The community indebtedness of the Cohens far exceeded community assets, and no spousal support was ordered. The family law court declined to reassign the husband his share of the community debts or to order the husband to reimburse his wife in full or in part for payment of these debts. The court found that such orders would "frustrate the intent and purpose of the federal bankruptcy act and violate the supremacy clause of the United States Constitution." The Court of Appeal agreed.

With respect to the order under review, we note that the court's initial directive that Marlene pay the balance of the C.I.T. Financial and

Bank of America obligations out of the proceeds from the community interest in Park Hall Investment may well have suffered from the same infirmity as the proposed order in *In re Marriage of Cohen.* To summarily order the bankrupt to satisfy these discharged obligations appears to run counter to the federal policy in bankruptcy of allowing the discharge of payments due under a property settlement agreement. But the focus of this case is not on payments ordered by the trial court to discharged creditors. Rather, we are reviewing an order modifying a spousal support obligation.

As a matter of policy, domestic relations is considered a field particularly suited to state control, and federal courts have traditionally been inclined to respect the power of state courts to make, modify, and terminate provisions for spousal support. As Justice Holmes said in *Ohio ex rel. Popovici* v. *Agler* (1930) 280 U.S. 379, 383 [74 L.Ed. 489, 497-498, 50 S.Ct. 154]: "It has been understood that, 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'" (Quoting *In re Burrus* (1890) 136 U.S. 586, 593-594 [34 L.Ed. 500, 503, 10 S.Ct. 850]. See also *De Sylva* v. *Ballentine* (1956) 351 U.S. 570, 580 [100 L.Ed. 1415, 1427, 76 S.Ct. 974]; *Buechold* v. *Oritz* (9th Cir. 1968) 401 F.2d 371, 373.)

█ There are many factors deemed pertinent by the State of California in establishing an adequate amount of spousal support. Indeed, a court can consider everything having a legitimate bearing on present and prospective matters relating to the lives of both parties. (*Hall* v. *Hall* (1954) 42 Cal.2d 435, 442 [267 P.2d 249]; *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 739, fn. 3 [145 Cal.Rptr. 205].) Some of the circumstances that are applicable to the case at bar are the needs of the parties, the abilities of the parties to meet such needs, property owned, obligations to be met, as well as the ability to earn and actual earnings. (*In re Marriage of Morrison* (1978) 20 Cal.3d 437, 454-455 [143 Cal.Rptr. 139, 573 P.2d 41]; *Hall* v. *Hall, supra,* 42 Cal.2d at p. 442.)

█ Proper grounds may always be presented for the purpose of modifying or revoking an award of spousal support. (Civ. Code, § 4801, subd. (a).) But the applicant must show the economic situation of the parties has changed since it is the economic relation which is to be af-

fected by the proposed modification. (*In re Marriage of Mulhern* (1973) 29 Cal.App.3d 988, 992 [106 Cal.Rptr. 78]; *Engelberg v. Engelberg* (1968) 257 Cal.App.2d 821, 824 [65 Cal.Rptr. 269]; *Double v. Double* (1967) 248 Cal.App.2d 650, 652 [56 Cal.Rptr. 687].) ■ In the instant case, the material change in the economic status of the parties was that the spouse to whom the support had been awarded had significantly reduced her indebtedness through bankruptcy which concomitantly increased the obligations to be met by the nonbankrupt spouse. ■ The fact that a spouse has incurred indebtedness may indicate such a change in his ability to pay support as to authorize a reduction in the amount of support payments. (*Dean v. Dean* (1963) 59 Cal.2d 655, 658 [31 Cal.Rptr. 64, 381 P.2d 944]; *Wise v. Wise* (1964) 228 Cal.App.2d 322, 330 [39 Cal.Rptr. 448].)

■ It has long been recognized that an appellate court's function in reviewing an order modifying spousal support is circumscribed. Under the governing principles, an order modifying an award for support constitutes an abuse of discretion only where it must be concluded no judge reasonably could have made such an order. (*In re Marriage of Melton* (1980) 107 Cal.App.3d 559, 564 [165 Cal.Rptr. 753]; *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 114 [113 Cal.Rptr. 58]; *In re Marriage of Siegel* (1972) 26 Cal.App.3d 88, 90 [102 Cal.Rptr. 613].) ■ The trial court's action in modifying the bankrupt spouse's support to compensate the nonbankrupt spouse for his increased payment obligations does not constitute a clear abuse of discretion requiring reversal. Indeed, the trial court's reasoning appears to have the unqualified endorsement of the state Legislature. Section 4812 of the Civil Code has been amended to specifically provide that the court may now consider discharged property settlements as a change that may justify modification of spousal support.[5]

Whatever the implications on *In re Marriage of Cohen, supra*, 105 Cal.App.3d 836, we emphasize that in our view questions concerning the modification of an obligation of spousal support are questions that must be decided under applicable state law. And when the propriety of

---

[5]Section 4812 of the Civil Code was amended in 1977 to read: "In the event obligations for *property settlement to a spouse* or support of a spouse are discharged in bankruptcy, the court may make all proper orders for the support of such spouse, as the court may deem just, having regard for the circumstances of the respective parties and the *amount of any obligations under a property settlement agreement which are discharged*." (Italics to the language added by amendment.)

the order reducing support in this case is examined under the existing law of California, it clearly must be upheld.

The judgment is affirmed.

Rouse, Acting P. J., and Smith, J., concurred.