[No. A112330. First Dist., Div. One. June 19, 2007.]

In re the Marriage of SYLVIA L. and JAMES TILGHMAN WEST.
SYLVIA L. WEST, Appellant, v.
JAMES TILGHMAN WEST, Respondent.

## COUNSEL

Provencher & Flatt and Janis H. Grattan for Appellant.

Bernheim & Hicks and Lawrence Bernheim for Respondent.

## OPINION

**STEIN, J.**—Sylvia L. West (Sylvia) appeals from an order reducing spousal support. We reverse.

### BACKGROUND

Sylvia and James Tilghman West (Til)[1] were married for 20 years, divorcing in November 1997. At that time, Sylvia was a homemaker, caring for the parties' two children, who were then 15 and five years old. Til was a successful businessman and insurance salesman, who had built up an insurance marketing corporation, which was in the process of being sold. By the time of the divorce, Til was earning between $17,775 and $19,750 per month working for another company. The parties entered into a marital settlement agreement which, as relevant, obligated Til to pay support to Sylvia with the expectation Sylvia would make reasonable good faith efforts to become self-supporting at some future date. The agreement also contemplated that the

---

[1] In using the parties' first names, we mean no disrespect to them, and are simply adopting the practice used by both parties' attorneys and by the trial court.

community business would be sold and the proceeds divided between the parties, with a small amount going to the parties' older child.

The business sold as expected. Each party received a payment of $65,000 and a promissory note for $388,388, to be paid off at 8 percent interest over six years. Each, accordingly, received quarterly payments of just under $20,000. In any event, and irrespective of any other amounts received by Sylvia, under the settlement agreement, Til agreed to pay family support to Sylvia in the amount of $8,500 per month effective January 1, 1997, through March 30, 1997. That sum increased to $9,500 per month effective April 1, 1997, through August 31, 1997, and then decreased to $6,795 per month as of September 1, 1997. It is not clear why the sum decreased as of September 1, 1997, but it seems likely that the decrease reflected the expectation Sylvia would be receiving payments on the promissory note from the sale of the business. The parties also recognized Til's actual income fluctuated, and further agreed support would be reviewed every six months and adjustments made as appropriate.

Four months later, Til's support obligations were reduced to $3,880, in part because the parties' son was then living, full time, with Til, and in part because Til's income had decreased. The amount of support was calculated through the DissoMaster program. For purposes of calculations through the DissoMaster, Til's gross monthly income was shown as $12,550 in wages and income, and each party was charged with $6,331 in "other taxable income," representing payments of both interest and principal on the promissory notes. Two months later, the parties' son moved back into Sylvia's household. Some adjustments to the amount of support appear to have been made, and Til thereafter paid Sylvia somewhere between $6,200 and $9,000 support per month. Later support negotiations also assumed each party was receiving $6,331 in "other taxable income."

The idea originally had been that Sylvia would pursue a degree in elementary school education with the goal of becoming an elementary school teacher. Her plans were delayed for various reasons, but she graduated from Sonoma State University in May 2002, obtained a substitute teaching credential in December 2002, took additional required courses during 2002 to 2003, and passed the CBEST test in August 2003. Sylvia then decided to change her career path and instead go into real estate sales.

In June 1999, Til filed a motion to modify support, complaining Sylvia was not making reasonable academic progress as contemplated by the marital settlement agreement, and asserting his income had dropped. Sylvia responded, complaining Til had not paid the full amount of support required by the marital settlement agreement. In the end, the parties stipulated that Til's

motion would be dropped from the calendar, that he would pay Sylvia $25,000 on or before February 1, 2000, plus an additional $5,000 nondeductible support by the same date. The parties further agreed Til's support payments would be $6,500 per month. The parties stipulated that either party was entitled to seek judicial review of the support award by motion or orders to show cause set to be heard on or after September 1, 2002. Their stipulation was incorporated into an order entered on May 25, 2000.

The promissory notes were paid off in spring 2003. Although the result was an immediate drop in income of $6,331 per month, Sylvia did not seek a modification of the support order.

## Motion for Modification of Support

In early 2005, Til filed another motion to modify support. He pointed out that the May 2000 order allowed him to seek judicial review of the support order anytime after September 1, 2002. Til asserted Sylvia had been enjoying a standard of living equal to or in excess of his own, had abandoned her plans to become a teacher to go into real estate and had been licensed for almost two years. Til asked the court to impute an income of $4,000 per month to Sylvia and to reduce support accordingly.

Sylvia responded, stating the actions she had taken towards obtaining her teaching credential. She explained she had realized her income would be dropping in spring 2003, and believed it would take another 18 months for her to obtain her teaching credential. She had become concerned that because of her age and the competition she would face, she was effectively unemployable as an elementary school teacher. She felt she needed to do something to accelerate her capacity to generate income. She also felt that the flexible schedule she would enjoy as a realtor would allow her to continue to be available to the parties' minor child. Sylvia's supervisor at her real estate office testified Sylvia had the attributes to succeed in that field and was taking the actions that would allow her to succeed. The supervisor acknowledged Sylvia had earned commissions of only $15,000 during the last half of the previous year, and had earned no commissions during the first half of 2005. The supervisor explained it generally took time for agents to develop business, stating her opinion that Sylvia actually had done very well for her first year in real estate.

Til also submitted a vocational assessment of Sylvia, done by Rachel Hawk of Work-Wise, Inc., Vocational Expert Services, that confirmed that teaching jobs would be difficult to obtain. Ms. Hawk opined that Sylvia was pursuing an occupational goal which appeared to be realistic for her. Ms. Hawk believed Sylvia should be able to earn a mean annual salary of $31,825 after

her second year of full-time work in real estate and $33,550 in her third year of practice. She reported that local research indicated some agents make nothing during the first year, and that agents needed to have substantial supplemental income for a year or two. Finally, she wrote it was reasonable to expect Sylvia to need a period of two years to fully establish her reputation and network of contacts in order to earn $31,825 per year.

In the meantime, Til's income had continued to rise. He had earned $404,207.91 in wages and compensation during 2004. For 2005, it was expected Til would receive draws of $12,800 twice a month, plus a vehicle allowance of $800, plus adjustments based on commissions earned.

### Trial Court's Decision and Order

The trial court, citing the factors set forth in Family Code section 4320, found no issue as to Til's earning capacity, obligations or ability to pay support. (Fam. Code, § 4320, subds. (a), (c) & (e).) The court did not fault Sylvia for changing her career path, finding her decision to be consistent with her obligation to earn to the extent of her abilities. It reported it was not convinced there was a basis to assess an earning capacity to Sylvia beyond what she actually was earning as a realtor, which the court found to be $534 per month. The court took note of the parties' "significantly comfortable" lifestyle at the time of separation, which allowed them to employ a maid, a gardener and a nanny, to travel often and to shop at "high-end" stores such as Nordstrom's or Romero's, and to drive expensive vehicles. It found Sylvia's current expenses to be approximately $8,500 per month, finding she continued to enjoy a comfortable lifestyle but did not enjoy the many extras the marital household had enjoyed.

The court declared itself puzzled by Sylvia's failure to save money, writing: "But by the same token, the Court is at a loss as to how Sylvia, over the past seven years, has been unable to accumulate any savings from the significant funds that she received from the sale of the community business. Had Sylvia made prudent use of those funds, the Court strongly believes that she would be enjoying a lifestyle much closer to that of the marital standard of living than she is at this time. To allow Sylvia's current financial situation and lifestyle to govern this decision without considering the amount of funds she has gone through in the last four years would be neither fair nor equitable to Til."

The court recognized Family Code section 4320 states a goal that the supported spouse become self-supporting within a reasonable time. It found, "[u]tilizing the guidepost stated in Family Code § 4320(*l*) that the supported spouse become self-supporting by a period generally equal to one-half the

length of the marriage, it would be generally anticipated that Sylvia would become self-supporting within an approximate 10 years. The parties' marriage was dissolved in November, 1997, a period of slightly less than 8 years." The court found neither party was suffering hardship, but the balance weighed slightly in favor of Sylvia in that she had had to abandon her desired career goal. "But offsetting this practical aspect is the glaring fact that Sylvia has not been able to maintain any savings from the approximate $500,000 that has been paid to her from the sale of the community business post-dissolution."

The court then ruled, "Weighing the above-reviewed factors under Family Code § 4320, the Court determines that Til is to pay Sylvia permanent spousal support in the amount of $4,000 effective January 1, 2005. This amount shall reduce to $2,500 effective January 1, 2006 and then shall reduce again to $0 effective January 1, 2007. [¶] Pursuant to *In re Marriage of Smith* 79 Cal.App.3d 725 [145 Cal.Rptr. 205] (1978), the Court finds that Sylvia will have a decreasing need for spousal support due to the following factors: (1) her favorable earnings outlook as testified to by her employer; (2) the fact that she has been provided significant cash assets from the sale of the community business; and (3) the duration of the marriage."

### Discussion

■ A spousal support order is modifiable only upon a material change of circumstances since the last order. "Change of circumstances" means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. It includes all factors affecting need and the ability to pay. Where there is no substantial evidence of a material change of circumstances, an order modifying a support order will be overturned for abuse of discretion. (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982–983 [48 Cal.Rptr.2d 864].) "The modification of a spousal support order is reviewed on appeal for abuse of discretion. In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence. [Fn. omitted.] If the trial court conforms to these requirements its order will be upheld whether or not the appellate court agrees with it or would make the same order if it were a trial court." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47 [35 Cal.Rptr.3d 716].)

■ Sylvia contends there was no adequate showing of changed circumstances justifying the court's order. As a threshold matter, we note the parties had stipulated that either might seek review of spousal support any time after September 1, 2002. The purpose of this stipulation is unclear. It might have been an agreement that neither party would seek a modification, despite a

material change in circumstances, until September 1, 2002. In the alternative, the parties may have been agreeing that either could seek judicial review of support after September 1, 2002, whether or not there had been a material change in circumstances. There is authority that the parties have the power to decide whether a particular event will or will not be deemed a material change of circumstances for purposes of modification of a support order. (See Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2006) ¶¶ 17.141 to 17.144, pp. 17-32.19 to 17-32.20.) Under this authority, at least arguably, the parties could agree to a judicial reevaluation of support even in the absence of a material change in circumstances. As we find a material change in circumstances did in fact exist here, we need not interpret the meaning of the May 2000 stipulation, or determine whether the parties were entitled to obtain judicial review by agreement.

## I.

### Career Change as a Change of Circumstances

A trial court considering whether to modify a spousal support order considers the same criteria set forth in Family Code section 4320 as it considered in making the initial order. (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1235 [43 Cal.Rptr.3d 642]), citing *In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 899 [117 Cal.Rptr.2d 520].) "[A] material change of circumstances warranting a modification of spousal support may stem from unrealized expectations embodied in the previous order. [Citation.] Specifically, changed expectations pertaining to the ability of a supported spouse to become self-supporting may constitute a change of circumstances warranting a modification of spousal support. [Citation.] Thus, if a court's initial spousal support award contemplates that a supported spouse will take some action to decrease the need for spousal support following the issuance of the order and the supported spouse fails to take that action, the court may modify the award on the ground of changed circumstances." (*Shaughnessy, supra*, at p. 1238.) Here, the parties' marital settlement agreement, the original order and the order of May 2000 were entered on the expectation Sylvia would pursue a teaching career. Her decision to abandon that career and take a different career path, however appropriate, was a material change of circumstances justifying the court in at least considering whether to modify spousal support. Moreover, Sylvia not only had changed her career path, but was in fact employed and was beginning to earn commissions. Again, there was a material change in circumstances.

## II.

### Stepdown Order

■ While we reverse the order modifying support, we find no fault with it to the extent it stepped down support on the assumption Sylvia's income would rise over the next two years. Stepdown orders are not per se objectionable. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 309 [111 Cal.Rptr.2d 755].) They must, however, be based on reasonable inferences to be drawn from the evidence, not mere hopes or speculative expectations. (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 656 [235 Cal.Rptr. 587].) It need not be shown the supported spouse certainly will be earning the presumed income. In *In re Marriage of Smith* (1978) 79 Cal.App.3d 725 [145 Cal.Rptr. 205], the court approved an order reducing support to $1 at the end of a four-year period, on evidence the wife would have received a bachelor's degree in business administration by that time. The court found it was reasonable to infer the wife's marketable skills would then be significantly greater than they were at the time of the order and she would be in position to accept employment on a full-time basis. (*Id.* at p. 740.) Similarly, in *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667 [143 Cal.Rptr. 94], the parties divorced after 27 years of marriage. The wife had not been employed for many years, but was taking secretarial training at the time of the support order and expected to obtain secretarial work at the completion of her training. The appellate court, although deeming it a close case, and reversing the support order on other grounds, did not find an abuse of discretion in the trial court's decision to step down support in light of the wife's anticipated earnings. (*Id.* at pp. 671–673.) Here, at the time of the order, Sylvia already was employed in her chosen profession. She had earned some money, and her supervisor believed she had the skills and personality to succeed in that field. The court also had before it an expert's opinion that Sylvia would be earning $31,825 after her second year of full-time work in real estate and $33,550 in her third year.

It should be emphasized that the order does not prevent Sylvia from obtaining spousal support above the amount ordered, or after January 1, 2007. Its effect is to shift the burden of showing changed circumstances from Til to Sylvia. Just as Til was entitled to seek a modification because of the unrealized expectation Sylvia would obtain a teaching credential, Sylvia would be entitled to seek a modification because of an unrealized expectation of her future earnings. (*In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 29 [28 Cal.Rptr.2d 201]; *In re Marriage of Smith, supra*, 79 Cal.App.3d at p. 741; *In re Marriage of Andreen, supra*, 76 Cal.App.3d 667, 673.)

## III.

### Effect of Reducing Support to $0

■ The court's reason for terminating support to $0 is unclear in that the order does not expressly state either that the court did or did not intend to retain jurisdiction over support after that date. Where a court intends to retain jurisdiction even though it expects the supported spouse to be self-supporting, it commonly reduces support to $1 as an indication that jurisdiction is retained. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6.1070, p. 6-396.) Nonetheless, an intent to terminate jurisdiction will not be presumed. *In re Marriage of Ousterman* (1996) 46 Cal.App.4th 1090 [54 Cal.Rptr.2d 403] concerned a spousal support agreement providing for monthly support payments until either party's death, the supported party's marriage or January 31, 1995, whichever first occurred. (*Id.* at p. 1092.) The court held that the agreement did not divest the trial court of jurisdiction to award support after January 31, 1995, pointing out that policy reasons favored a finding of continued jurisdiction and the agreement did not contain a clear termination date. (*Id.* at pp. 1096–1098.) Like the agreement in *Ousterman,* the order here contained a clear date for the termination of support, but not a clear date for the termination of jurisdiction. Following that case and the policies and authorities cited therein, we find the order did not terminate jurisdiction over spousal support on January 1, 2007.

## IV.

### Reasons for Reducing Support

We have found the court was entitled to modify the previous support order, was entitled to determine that Sylvia's income would rise over the next several years and was entitled to issue a stepdown order. We also find the court considered the various factors set forth in Family Code section 4320 in determining support. However, two of the three factors stated by the court for reducing support provide no justification for its order, and even the third factor, while providing a basis for reducing support generally, provides little if any justification for what the court actually did.

■ The court cited three factors: (1) Sylvia's favorable earnings outlook; (2) that Sylvia had received a significant cash asset from the sale of the community business, and (3) the duration of the marriage. We have addressed the first of these factors, which we have found to be based upon the evidence and reasonable inferences arising from the evidence. We find Sylvia's favorable earnings outlook justified a decrease in spousal support. But the order decreased support retroactively to January 1, 2005, when there was no

evidence Sylvia had actually earned anything for the period from January 1, 2005, to June 29, 2005. To the contrary, the undisputed evidence was that Sylvia had earned nothing for that period. In addition, that Sylvia might be expected to earn $31,825 after her second year of employment does not justify reducing her support by $48,000 for that year, and that she might be expected to earn $33,550 after the third year does not justify reducing her support by $78,000, particularly in light of her undisputed annual expenses of $102,000 and Til's undisputed ability to pay support.

It is not wholly clear how the court factored in the funds Sylvia received from the sale of the community business. What *is* clear is that Sylvia had ceased to receive any income from that sale in spring 2003. We fail to see how a loss of income can justify a reduction in support. The court clearly was puzzled about what Sylvia had done with the money, and may have been imputing to her the interest income it believed she could have received had she preserved the principal. But Sylvia already was in effect imputing that income to herself by not seeking an increase in support once the payments on the promissory note were exhausted. The promissory note and the payments thereon were Sylvia's fair share of the community property, and the marital settlement agreement and subsequent orders gave Sylvia spousal support in addition to that share. The court in *In re Marriage of Rabkin* (1986) 179 Cal.App.3d 1071, 1081 [225 Cal.Rptr. 219] pointed out "[i]t makes no more sense to reduce wife's spousal support because she received her rightful share of the community property than it would to increase wife's spousal support because husband received his rightful share of the community property." On a similar note, it makes no more sense to reduce Sylvia's support because she failed to invest her share of the community property asset than it would to increase Til's support payments because he invested his share.

There is authority that a spouse's failure to manage her finances in such a manner as to enable her to become self-supporting justifies termination of support. (See, e.g., *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902, 909–910 [243 Cal.Rptr. 179].) The foundation for this authority is that the spouse's share of the marital assets was sufficient to provide self-sufficiency in the accustomed lifestyle. (*Id.* at p. 910.) In other words, a party cannot dispose of income-earning property and expect the supporting spouse to make up the difference. Similarly, it may be appropriate to impute income to a spouse of sums that could be earned by an income-producing investment strategy. (See *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 930–932 [95 Cal.Rptr.2d 760].) But such authority is irrelevant here where Sylvia was not seeking an increase in support to cover the interest lost when the note was paid off.

Because Sylvia has not sought an increase in support to cover the loss of income resulting from the exhaustion of the note, there is no need to consider

whether the parties understood and agreed that Til's support obligations would be based, in part, on both the interest and the principal Sylvia would be receiving on the note. It also is not particularly relevant that there is no evidence, and no evidence from which it might be inferred, that Sylvia used the principal for anything other than to cover unexpected expenses[2] or to maintain a standard of living comparable to the marital standard of living.

It also is unfair to penalize Sylvia for failing to invest the principal without first warning her that she would be expected to invest it. (See *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, 711–712 [250 Cal.Rptr. 148] [reversing an order penalizing the wife for failing to take actions to become self-supporting without having first warned her of the expectation that she would be expected to become self-supporting]; see also *In re Marriage of Schmir, supra,* 134 Cal.App.4th at p. 58; *In re Marriage of Heistermann* (1991) 234 Cal.App.3d 1195, 1204 [286 Cal.Rptr. 127].) In sum, that Sylvia received a substantial cash asset upon termination of the marriage provides no grounds for later reducing support, and even if it did, it would be an abuse of discretion to penalize her for failing to invest that asset without providing her with fair warning of the court's expectations.

■ As to the third factor—duration of the marriage—the trial court explained, "Utilizing the guidepost stated in Family Code § 4320(*l*) that the supported spouse become self-supporting by a period generally equal to one-half the length of the marriage, it would be generally anticipated that Sylvia would become self-supporting within an approximate 10 years. The parties' marriage was dissolved in November, 1997, a period of slightly less than 8 years." Family Code section 4320, subdivision (*l*) requires the court to consider, "The goal that the supported party shall be self-supporting within a reasonable period of time. *Except in the case of a marriage of long duration as described in Section 4336,* a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage." (Italics added.) Section 4336 defines a marriage of long duration as a marriage of 10 years or more. The parties here had a marriage of long duration. Family Code section 4320, subdivision (*l*), therefore, is inapplicable. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 6.926.4, p. 6-337.) The court should not have given any weight to the one-half the length of the marriage factor.

---

[2] Sylvia did spend a substantial amount of money on the parties' son after he became involved in criminal conduct, was put on probation and was enrolled in a six-month program that included two weeks in the Philippines as part of an "outward bound" kind of program. The six-month program alone cost $36,000. She also paid attorney fees between 1998 and 1999 totaling approximately $30,395.

## CONCLUSION

We reverse the order reducing support, finding that it is not supported by the factors articulated by the court. We take no position on whether the court had the discretion to reduce support for other, unarticulated factors.

The order is reversed. Sylvia is entitled to her costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.