Filed 4/21/16  Marriage of Shepherd CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of SCOTT G. and CINDY D. SHEPHERD. | H039876 (Santa Cruz County Super.Ct.No. FL26949) |
| SCOTT G. SHEPHERD, Appellant, v. CINDY D. SHEPHERD, Respondent. | |

The appeal in this highly contentious dissolution proceeding is from a 2013 postjudgment order denying a motion to modify spousal support.  In November 2010, the court ordered appellant Scott Shepherd to pay respondent Cindy Shepherd permanent spousal support of $7,828 per month.[1]  In addressing spousal support, the court heard evidence concerning two employee transition loans totaling $980,096 (the loans) that Scott had received when he changed jobs in 2009.  The loans were subject to being forgiven proportionally over nine- and five-year periods, respectively, so long as Scott remained with the employer-lender and met specified performance goals.  In the court's

---

[1] "Hereafter, we refer to the parties by their first names, as a convenience to the reader.  We do not intend this informality to reflect a lack of respect.  [Citation.]"  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

November 2010 order, the court held that the loan proceeds were "[Scott's] separate property, to be characterized as income available for support as the loans are forgiven."

In April 2013, Scott moved to modify the support order based upon an alleged change of circumstances, including (1) a significant reduction in his income as a financial advisor/stockbroker, (2) a depletion of available funds originating from the loans, and (3) Cindy's failure to seek or obtain employment within a reasonable time. The court denied the motion to modify and awarded Cindy attorney fees of $10,000.

Scott contends on appeal the court abused its discretion by denying the motion to modify spousal support. He argues that (1) his income was substantially reduced from the level upon which the original support order was based; (2) his available income was further reduced because he was required to make annual income tax payments on the loans; and (3) the proceeds from the loans—which had been used to fund spousal support—were exhausted. Scott also contends the court erred in failing to consider that Cindy had not made efforts to seek employment within a reasonable time period. Lastly, Scott asserts the court abused its discretion in awarding Cindy $10,000 in attorney fees.

We conclude the court abused its discretion by denying Scott's motion to modify spousal support and by awarding attorney fees to Cindy. Accordingly, we will reverse and remand the matter for further proceedings.

PROCEDURAL HISTORY

I.     *Trial and Judgment of Dissolution*

Scott filed a petition for dissolution of his marriage with Cindy on July 10, 2008. The two contested issues at trial were the characterization of the loans Scott received in 2009 from his new employer, UBS Financial (UBS), and a determination of spousal support. After a six-day trial commencing in December 2009 and concluding in June 2010, the court (Hon. John S. Salazar) issued its statement of decision on November 24, 2010.

2

In the statement of decision, the court recited that the parties were married on June 3, 1989, and had separated on July 10, 2008. As of November 2010, Scott and Cindy were 52 and 54 years old, respectively, and they were both in good health. They had two children, Chase (born in July 1991) and Connor (born in June 1993). The parties stipulated that child support for Connor would be $1,629, based upon Scott's estimated 2010 income of $222,655.

The court noted that Cindy had argued the loans were community property because Scott received them in consideration of his "bringing clients from Morgan Stanley," his former employer, to UBS. She characterized Scott's "book of business" as a community asset. Scott argued "the transfer of clients was a natural result of his move to [UBS], and that his post[-]separation efforts [were] required in order for the loan forgiveness to occur." The court rejected Cindy's position, concluding the loan proceeds were "[Scott's] separate property, to be characterized as income available for support as the loans are forgiven."

The court fixed spousal support at $7,828 per month, retroactive to June 14, 2010. (Scott had previously been paying temporary spousal support of $3,551 per month.) The court derived the $7,828 figure from several factors, including Cindy's marketable skills and earning capacity, the needs of the parties based upon the marital standard of living, and Scott's ability to pay spousal support.

Cindy was 54 at the time of trial. She had received a high school diploma in 1974, had attended one year of college, and had not been employed outside the home since 1991. Cindy's vocational plan—presented in the testimony of her vocational expert, Timothy Harper—was approved by the court and found to be "reasonable." It involved Cindy's attendance in school to improve her computer and business skills, and her enrollment in junior college in an interior design program to improve her marketable skills and potential earning capacity. The court found that while Cindy "could earn a small [amount of] income at this time, it would be more prudent to place her entire focus

3

on increasing her earning capacity, especially in this depressed job market." It added that as long as Cindy "continue[d] on her chosen path of career development, she [was] required to attend school/training full time." The court ordered that if Cindy ceased attending school, she was required to seek and maintain full-time employment, and if she attended school part time, she was required to obtain a part-time job. The court ordered that (1) any income Cindy earned would be deducted from her spousal support, and (2) Cindy had to report her income to Scott on a quarterly basis, beginning April 1, 2011.

The court also considered the needs of the parties based upon the standard of living established during the marriage. In that respect, the court found that "the parties enjoyed an upper middle class lifestyle; however, they appeared to have lived somewhat beyond their means." It based this conclusion on the fact that at the time of the parties' separation, their savings were minimal, their liabilities in addition to their mortgage were numerous, and Cindy's $100,000 inheritance had been exhausted. The court also found that both parties, contrary to their testimony, continued to maintain their pre-separation lifestyles, with Scott doing so "by spending his advanced income," and Cindy doing so with her mother's financial assistance. It concluded that Scott's income "ha[d] remained stable, and appear[ed] to be increasing," and Scott had access to a large sum of cash (i.e., the UBS loans). Cindy, on the other hand, had no income, and was reliant upon support paid by Scott and additional money from her mother. The court concluded that Cindy would "require $7,828 (pre-tax 2010 dollars) per month to achieve the marital standard of living."

Another factor the court considered was Scott's ability to pay spousal support. In the five years before separation, Scott's gross income from Morgan Stanley ranged from $195,000 to $225,000. The court noted there had been no evidence presented that Scott's income would decrease in the future. It cited the testimony of an expert witness, Donald Glenn (a certified public accountant), who estimated Scott's annual income—anticipated

4

base pay, commissions, and forgiven amounts of the loans—to be $222,655 (2010) and $248,060 (2011).

The court also addressed Cindy's request for attorney fees pursuant to Family Code sections 271, 2030, and 2107.[2] The court found that Scott had engaged in fraudulent conduct before the parties' separation (falsifying tax returns and diverting joint funds to his separate bank accounts) that warranted sanctions of $30,000 pursuant to section 271. The court did not award fees pursuant to sections 2030 or 2107, finding that "each party paid, or will pay[,] for their attorney's fees from borrowed funds." The court concluded: "The amount of incurred attorneys' fees in this case is astronomical, reported to be in the area of $700,000 between the two parties. There is no way to justify the exorbitant expenses incurred in this case. Neither party has sufficient funds of their own to cover these fees. The playing field was even."

A judgment of dissolution was entered on February 8, 2011. The judgment, among other things, incorporated by reference the court's November 24, 2010 statement of decision. Neither party appealed the judgment.

II. *Scott's 2011 Motion to Modify Spousal Support*

On August 5, 2011, Scott filed a motion to modify or terminate spousal support (the 2011 motion), claiming that changed circumstances warranted a reduction or termination of support. He later withdrew his request for termination of spousal support, but not his request to reduce the amount of spousal support. He asserted that his earnings since he had started working at UBS in February 2009 were significantly less than they had been at Morgan Stanley. He contrasted his UBS earnings—$69,617 (2009), $120,089 (2010), and $123,400 (2011 [projected])—with his Morgan Stanley earnings of $222,401 in 2008. Scott indicated that, given the economic times, it would be several additional years before his income level would reach pre-2009 levels. Scott also

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

5

contended that a large portion of the loans he received from UBS were no longer available to him. He stated that he had expended or lost control of more than 79 percent of the $691,832 he had received because:[3] (1) he had paid $240,000 in attorney fees, mostly in successfully defending against Cindy's claim that the loans were community property; (2) he had paid $30,000 to Cindy pursuant to the court's sanctions order; and (3) $276,732 had been set aside in a trust account for support payments to Cindy. Scott pointed out that although these funds were no longer available to him, he would continue to pay taxes on the loan proceeds for seven more years as the loan amounts were incrementally forgiven. Finally, Scott argued that Cindy should have obtained employment by the time of the motion, i.e., more than three years since the parties' separation.

Cindy opposed the 2011 motion. She asserted that the motion, brought only seven months after the entry of judgment, offered no new or different information presenting a material change in the financial circumstances of the parties. She noted that she had been following the plan previously approved by the court of pursuing formal education. She was enrolled full time at West Valley College in the interior design program and anticipated completing the program by June 2013. Cindy also requested that, in light of the fact that Scott was no longer paying $1,629 in child support, monthly spousal support should be increased to $10,000. Lastly, Cindy sought an award of $30,000 in attorney fees and costs under sections 271, 2030, and 2032.

Cindy subsequently filed a motion for sanctions pursuant to Code of Civil Procedure section 128.7, arguing that the 2011 motion was brought for an improper purpose—to harass Cindy—and to needlessly increase the cost of litigation. She sought

_____

[3] In the 2011 motion, Scott inexplicably referred to the loan proceeds as $691,832, the amount of the first loan, but made no mention of the second loan made by UBS in 2009 in the sum of $288,264. Scott did, however, reference the second UBS loan in his income and expense declaration filed on August 24, 2011.

6

sanctions of $40,000, in addition to attorney fees of $10,000 in opposing the 2011 motion. Later, in her reply papers, Cindy modified her attorney fee request, seeking $120,000 in attorney fees and costs.

At an unreported trial readiness conference on March 22, 2012, the court (Hon. Jeff Almquist) summarily denied the 2011 motion, concluding in a minute order that "there is no change of circumstance." In a subsequent minute order after a hearing on Cindy's motion for sanctions held on April 2, 2012, the court confirmed the denial of the motion, indicating: "[Scott] is a financial planner[4] and knew what support would be and what his obligations were at the time support was set. [¶] The court finds no material change of circumstances and that there are no adequate grounds for the motion." The court had also heard testimony from Cindy concerning her education and employment efforts and found that she was "in compliance with Judge Salazar's order contained in the Statement of Decision filed 8/17/12 [*sic*]." The court took under submission Cindy's motion for sanctions.

In a formal order of August 29, 2012, the court imposed net sanctions of $2,500 against Scott pursuant to section 271. This net amount was derived from (1) sanctions of $5,000 imposed against Scott, based upon finding that the 2011 motion "was never more than a request for a new trial, made without an adequate showing, or a motion for reconsideration with no new facts and no new law"; and (2) sanctions of $2,500 imposed against Cindy, based upon the finding that "[Cindy's] attorney fee claim for $120,000 was essentially undocumented." The court also awarded Cindy reasonable attorney fees of $15,000 and reimbursement of expert fees of $4,000, payable by Scott.

Neither party appealed the order denying the 2011 motion or the order imposing sanctions and awarding attorney fees.

---

[4] At the hearing on April 2, 2012, Scott's counsel clarified that Scott was a commissioned salesperson, not a financial planner. As indicated in the court's statement of decision, Scott's chosen profession was "in the stock broker/financial advisor field."

7

### III. *Scott's 2013 Motion to Modify Spousal Support*

On March 8, 2013, Scott filed a second motion to modify spousal support (the 2013 motion). In support of his request that the court reduce spousal support to an unspecified amount, Scott declared, among other things, that (1) the loan proceeds used to fund spousal support payments had been exhausted; (2) he would continue to pay taxes on forgiven loan amounts and imputed interest for an additional five years; (3) were he to lose his job at UBS, he would still be responsible for repayment of the portion of the loans not forgiven ($557,309 as of the time Scott filed a supplemental declaration in May 2013); (4) his annual "net earnings"—a term he did not define—for 2010, 2011, and 2012 were significantly less than the annual spousal support obligation of $99,936;[5] (5) at $7,828 per month, he could not pay spousal support from his net earnings, let alone pay for his own living expenses; (6) he could not have foreseen in 2009 when he joined UBS "that the Court would [have] permit[ted Cindy] to not work a day in the last 5 years" even though she was warned three times that she was expected to become self supporting; and (7) due to the ongoing financial crisis, his gross income from UBS had still not recovered to the level it was in 2008 when he was employed at Morgan Stanley, a circumstance he could not have foreseen at the time he joined UBS.

Cindy opposed the 2013 motion. She argued, among other things, that Scott had "not offered any 'new or different' information to demonstrate a 'material change' in his financial circumstances" warranting modification of the spousal support order. She also requested an award of attorney fees of $20,000 pursuant to section 2030.

---

[5] Scott listed his annual net earnings (however that term was defined) as $60,326 (2010), $55,361 (2011), and $77,349 (2012).

The court heard argument during a short hearing held on June 5, 2013.[6] It denied the 2013 motion, finding there was no change of circumstances warranting relief. The court also awarded Cindy $10,000 in attorney fees pursuant to section 2030.

Scott filed a timely appeal from the order. A postjudgment order granting or denying a motion to modify spousal support is an appealable order. (Code of Civ. Proc., § 904.1, subd. (a); see *In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1158.)

DISCUSSION

I.      *Motions to Modify Orders for Spousal Support*

A spousal support order, with certain exceptions not relevant here, may be modified or terminated at any time by the court. (§ 3651, subd. (a).) Spousal support may only be modified "upon a material change of circumstances since the last order. 'Change of circumstances' means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. It includes all factors affecting need and the ability to pay." (*In re Marriage of West* (2007) 152 Cal.App.4th 240, 246.) The requirement that there be a showing of a material change of circumstances is "to prevent parties from relitigating issues that the court has previously addressed." (*In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, 1071-1072.)

"Whether a modification of a spousal support order is warranted depends upon the facts and circumstances of each case." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 357.) In deciding a motion to modify a spousal support order, the court is required to address the same factors it must consider under section 4320 in making an initial spousal support order. (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1235.) Those statutory factors include (1) "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living

---

[6] At oral argument, the parties agreed that the hearing—transcribed in a four-page reporter's transcript—was approximately six minutes in duration.

9

established during the marriage"; (2) the supporting party's ability to pay support, based upon his or her "earning capacity, earned and unearned income, assets, and standard of living"; (3) the parties' respective needs, "based on the standard of living established during the marriage"; (4) the parties' respective assets and liabilities, including separate property; and (5) "[t]he balance of the hardships to each party." (§ 4320.) The court must also consider "[a]ny other factors the court determines are just and equitable." (§ 4320, subd. (n).)

The moving party bears the burden of demonstrating that "the economic situation of the parties has changed, since it is the economic relation which is to be affected by the proposed modification. [Citations.]" (*In re Marriage of Clements* (1982) 134 Cal.App.3d 737, 745-746.) A failure to realize reasonable expectations contemplated at the time of the prior order may constitute a material change of circumstances warranting modification. (*In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 29.) But while proof of a material change of circumstances is generally required to grant a motion to modify spousal support (cf. *In re Marriage of Freitas*, *supra*, 209 Cal.App.4th at p. 1069 ["changed circumstances rule is not to be applied mechanically or without exception"]), the court is not required in all instances to grant the motion if such a showing is made. (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1484.)

We review an order granting or denying a motion to modify a spousal support order for abuse of discretion. (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 7.) "In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence. If the trial court conforms to these requirements its order will be upheld whether or not the appellate court agrees with it or would make the same order if it were a trial court." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47, fn. omitted.) If a finding of a material change of circumstances is unsupported by

substantial evidence, "an order modifying a support order will be overturned for abuse of discretion. [Citation.]" (*In re Marriage of West*, *supra*, 152 Cal.App.4th at p. 246.)

The trial court abuses its discretion when, after considering all of the circumstances, its decision "has 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances. [Citations.]" (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.) Although our review is one that is deferential, in that the trial court is accorded the discretion to assign the appropriate weight to the statutory factors relevant to spousal support, the trial " 'court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities.' [Citation.] Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error. [Citations.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304, original italics.)

## II.     *Denial of 2013 Motion to Modify Was an Abuse of Discretion*

### A.     Contentions of the Parties

Scott makes several arguments in support of his contention that the trial court abused its discretion in denying the 2013 motion. He asserts that a material change of circumstances existed that the court failed to recognize, and the court did not give appropriate consideration to some of the criteria specified in section 4320. He argues the court did not properly consider "[t]he ability of the supporting party [Scott] to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).) Specifically, he contends the court failed to consider that (1) all of the loan proceeds were exhausted; (2) Scott would continue to pay taxes on the balance of the loans and imputed interest for

11

five more years, even though the proceeds were no longer available; (3) although the proceeds were no longer available, Scott was nonetheless still liable for $614,962 of the loans and would be required to pay the loans back in full if he lost his job with UBS;[7] (4) Scott's annual commission income with UBS had continued to be at levels significantly lower than his pre-2009 commission income with Morgan Stanley; and (5) Scott's "net income" for January 1 through May 15, 2013—which term was undefined but which we infer to be take-home pay—was $34,392, an amount less than his total spousal support obligation for that same period.

Scott also argues that the trial court failed to give proper consideration to Cindy's earning capacity (§ 4320, subd. (a)), and "[t]he goal that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (l).) He asserts that at the trial before Judge Salazar in May 2010, Cindy's vocational expert, Timothy Harper, testified that, while Cindy should be given the opportunity to attend school to study interior design, she would be ready to start looking for work between January and June 2011. But Harper then presented an updated vocational evaluation in June 2012 in connection with the 2011 motion in which he indicated a likelihood that Cindy would be ready to enter the workforce in Spring 2013, or by the end of Fall of that year if she took extra classes or summer school. Cindy testified in that proceeding that she would complete her classes to become an interior designer by December 2013. Because the loan proceeds are now exhausted and Scott's commission income has not returned to its pre-2009 level, Scott argues the circumstances have changed and the court failed to consider the statutory goal of supported spouses becoming self-supporting in light of these changed circumstances.

Lastly, Scott argues the trial court failed to consider "[t]he needs of each party based on the standard of living established during the marriage." (§ 4320, subd. (d).) He

---

[7] The record shows that at the time of the hearing on the 2013 motion (June 2013), the total loan balance was $557,312.

12

contends the court failed to consider his need to support himself, given that the monthly spousal support obligation of $7,828 exceeded his monthly net pay. He argues further that "for at least 20 months, Cindy had been increasingly including thousands of dollars of the parties' adult children's expenses as part of her purported spousal support needs, and had been spending at far above her $7,828 reasonable needs under the marital standard of living." He asserts this is an additional change of circumstance the court should have evaluated.

Cindy responds that there is no material change of circumstances warranting the modification of the spousal support order. Generally, she asserts that Scott's alleged grounds for the modification request in the 2013 motion were ones that he had previously raised in the 2010 trial or in the 2011 motion. She argues, among other things, that (1) the court, in establishing spousal support in 2010, took into consideration the fact that Scott's annual gross income would include a loan-forgiveness component; (2) Scott's expert, Donald Glenn, accurately predicted the loan-forgiveness amounts for 2010 through 2012; (3) the court in 2010 anticipated that Scott's gross earnings would be $222,655 for 2010 and $248,060 for 2011, and Scott's earnings were in excess of the anticipated figure in 2010 ($224,632), slightly below the anticipated figure in 2011 ($239,609), and were much higher in 2012 ($355,031); (4) Scott accepted the consequences of the loans, including their tax consequences, and cannot complain about them in seeking modification of spousal support; (5) there was no change of circumstances regarding Cindy's efforts in seeking employment, and Scott is simply relitigating an issue he lost in the 2011 motion; and (6) Cindy established that she had complied with orders concerning vocational training.

B. The Employee Transition Loans

Scott declared in the 2011 motion that shortly after he filed for dissolution in July 2008, "the financial markets entered into a period of unprecedented financial instability." He feared that his employer, Morgan Stanley, would cease business operations like its

13

competitors, Bear Sterns and Lehman Brothers. He therefore decided to leave Morgan Stanley, and in January 2009, he joined UBS, a company he thought to be more stable.

After commencing employment with UBS in 2009, Scott received two loans from UBS that totaled $980,096. He received the proceeds from the first loan ($691,832) on or about February 25, 2009, and the proceeds of the second loan ($288,264) on or about September 25, 2009. Scott explained that such transition loans are common in the brokerage field to assist a financial advisor who changes jobs during "the several years [it may take] to rebuild sales/production to the same level as before the transition." The payments to the employee are structured as a loan or loans, with the principal amounts to be forgiven incrementally over a period of seven to nine years, so that taxes do not have to be paid by the employee in a lump sum in the year the funds are received.

According to the loan schedules submitted in connection with the 2013 motion, UBS each year is forgiving one-ninth of the total principal of the first loan to Scott (i.e., $76,870.22) over a period of nine years. The loan forgiveness commenced in January 2010 and will conclude in January 2018. UBS each year is forgiving one-fifth of the total principal of the second loan to Scott (i.e., $57,652.80) over a period of five years, with the forgiveness commencing in March 2012 and concluding in March 2016. As of March 2013, $307,480.88 and $115,305.60 of principal balances of the first loan and second loan, respectively, had been forgiven. In addition to having the forgiven portions of the principal balance of each loan declared as income according to the designated schedule, imputed interest on the forgiven loan amounts was also reported as income to Scott. Between 2010 and March 2013, a total of $143,275.02 of imputed interest was reported as income.

When Scott filed the 2011 motion, he declared that he had expended or lost control of $546,732 (over 79 percent) of the $691,832 loan proceeds because he had (1) spent $240,000 in attorney fees in the dissolution proceeding, (2) paid $30,000 in sanctions to Cindy, and (3) placed $276,732 in a trust account to fund support payments

14

to Cindy. On March 16, 2012, shortly before the unreported trial readiness conference in which the court denied Scott's 2011 motion, Scott filed a supplemental declaration. He declared that, of the $980,096 of original loan proceeds, he only had control of approximately $200,000. The remaining amounts were expended to fund the trust account, pay the sanctions award, pay his attorney fees, and supplement his salary to cover living expenses, including loan repayment. When Scott filed the 2013 motion, he declared that the entire loan proceeds had been exhausted.[8]

### C. The Trial Court Must Reconsider the 2013 Motion

Some of the circumstances Scott contends amount to changed circumstances existed at or prior to the 2011 motion; therefore, those circumstances could not serve as proper grounds for modification of spousal support in the 2013 motion. Most significantly, Scott's ongoing liability for a substantial portion of the loans was not by itself a material change of circumstances. The character of the loans was fully known at the time of trial in 2010. Furthermore, Scott's contention that Cindy's failure to become employed by March 2013 constituted a change of circumstances is likewise without merit. Scott argued at length in the 2011 motion that Cindy had not sought and obtained employment within a reasonable period of time. On April 2, 2012, the court found Cindy to be "in compliance with Judge Salazar's order." Thus, Scott cannot assert that Cindy's failure to earn income by March 2013 constituted a material change of circumstances. To do so would be an attempt to relitigate an issue decided against him in the 2011 motion. (See *In re Marriage of Olson*, *supra*, 14 Cal.App.4th at p. 14 ["change of circumstances referred to occurs 'since the last order' "].)

---

[8] The parties disagree on one aspect of the structuring of the loans. At oral argument, Cindy's counsel asserted that UBS in essence pays the taxes on the loan forgiveness. Scott's counsel responded by indicating that UBS does not pay taxes on the loan forgiveness. The record concerning this issue is unclear, but in any event this issue is not critical to our analysis. As discussed, *post*, we conclude the order must be reversed and the matter remanded for further consideration of the 2013 motion so the trial court can consider all of the factors stated in section 4320.

15

But Scott did demonstrate in the 2013 motion a change of circumstances regarding his ongoing ability to pay spousal support due to extraordinary expenses that depleted the loan proceeds. It was undisputed that by the time of the 2013 motion, there were no funds left from the loans from which Scott could draw to make spousal support payments. In November 2010, when the court initially established monthly spousal support of $7,828, it contemplated that portions of the loan would be considered "income available for support as [portions of] the loans [we]re forgiven." "[A] change of circumstances may be in the form of 'unrealized expectations.' " (*In re Marriage of Beust*, *supra*, 23 Cal.App.4th at p. 29; see also *In re Marriage of Hoffmeister*, *supra*, 191 Cal.App.3d at p. 365 ["a deviation from . . . reasonable expectations" may constitute a change of circumstances].) The continued availability of funds from the loans was a reasonable expectation that, in this instance, was unrealized. Thus, the extraordinary expenses that led to the exhaustion of the loan proceeds constituted a material change of circumstances.

The circumstances presented in the 2013 motion were in contrast to those presented in the 2011 motion, when at least $200,000 of the loan proceeds were available to fund support payments. Scott argued in the 2011 motion that the proceeds of the UBS loans were being depleted and that only a portion of the principal (approximately $200,000) remained available to him. But complete exhaustion of the loan proceeds due to extraordinary expenses—as opposed to a significant depletion of the funds—is a different circumstance. Coupled with the remaining circumstances concerning Scott's continuing ability to pay support (discussed below), the unavailability of loan proceeds due to extraordinary expenses constituted a material change of circumstances warranting consideration of the 2013 motion.

In addressing the ability-to-pay factor, Scott also showed in the 2013 motion that his earned income, taking into account depletion of the loan funds due to extraordinary expenses, could not support an obligation of $7,828 per month. As noted in the court's

16

November 2010 statement of decision, Scott's annual income from Morgan Stanley for the five years before separation in July 2008 ranged from $195,000 to $225,000. The record showed that Scott's annual earnings from UBS (excluding loan forgiveness) were significantly less than his pre-2009 income levels. His gross earnings from UBS between 2009 and 2012 ranged from $77,515 to $159,348. He declared that his "net pay" from January 1 to May 15, 2013—which we infer to be his take-home pay—was $34,392. This projects to $91,712 annually (approximately $7,643 per month), a sum less than the annual spousal support obligation of $93,936 ($7,828 monthly).

The court, in considering the motion to modify spousal support, was required to consider all of the statutory criteria in making an initial support order. (*In re Marriage of West*, *supra*, 152 Cal.App.4th at p. 247.) One such factor was Scott's ability to pay support. Indeed, the supporting party's ability to pay is "the fundamental factor" in a court's analysis in a support order. (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1106; see also *In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 304 [supporting party's ability to pay is "a key factor"].)

Here, the record shows the court *did* consider Scott's ability to pay. But as seen from the following exchange between the court and Scott's counsel at the hearing on the 2013 motion, the court misapprehended the severe limitations on Scott's current ability to comply with the spousal support order due to the payment of extraordinary expenses. Instead, the court focused only on Scott's reportable gross income: "[Court:] Well, I've read all your papers and I still don't see much in the way of a change in circumstances. [¶] . . .[¶] Mr. Sheperd says he's getting poorer and poorer while he's getting richer and richer. I don't get it. [¶ Scott's Counsel:] Well, if you look at the actual cash he has to pay support, the net income that he has is $7600 a month. With his living expenses and the spousal support amount of [$]7800 a month, he doesn't have the money to . . . pay support. [¶] And I guess where does it come from, now that the loan proceeds have been exhausted, Judge? [¶ Court:] From his ever-increasing income in the booming stock

17

market.  [¶] . . . [¶] It's gone up every year since 2009.  [¶ Scott's Counsel:]  His taxable income has increased, and the Court knows from—  [¶ Court:] The increase is—the imputed part is flat.  It's been divided by five and the same every year.[9]  The actual income is going up every year because he's getting more commissions and the stock market is[,] like I say[,] booming."  Thus, the court apparently considered Scott's increasing gross taxable income without regard to Scott's actual take-home pay or whether he had the resources to continue funding spousal support at the level of $7,828 per month.[10]  (See *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 824-825 [court abused its discretion by basing spousal support order on supporting spouse's 1996 income, when undisputed evidence was that his current income more than two years later was 57 percent lower].)

An analogous case in which the trial court failed to recognize the supporting party's changed financial circumstances—specifically, the ability-to-pay factor—is *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375.  There, the supporting party (Paul) sought a downward modification of spousal support.  Paul had been a successful real estate partner in a large law firm, but was terminated due to a downturn in the real estate market.  (*Id.* at p. 1379.)  He became in-house counsel for a builder, receiving a base salary of less than 50 percent of his salary at his former law firm, but was potentially eligible for a significant discretionary year-end bonus.  (*Ibid.*)  Paul also showed that with

---

**9** The court was incorrect that the loans were being forgiven in equal amounts over a period of five years and that therefore the imputed amount of income each year from the loans is "flat."  As noted, the first loan of $691,832 was subject to being forgiven over a period of nine years (2010 to 2018), while the second loan of $288,264 was subject to being forgiven over five years (from 2012 to 2016).  This structure resulted in a significant increase beginning in 2012 of the amount of loan forgiveness and imputed interest reflected on Scott's W-2 forms.

**10** The record, including Scott's W-2 forms, showed that Scott's reportable income (including loan forgiveness and imputed interest amounts which are identified in parentheses with the notation "loan") was as follows:  $77,515 (2009); $224,632 (2010; $104,543 loan); $239,609 (2011, $101,468 loan); and $355,031 (2012, $195,685 loan).

his current position, nearly his entire take-home pay was needed to fund support obligations. He was required to borrow to meet his own monthly living expenses, with the hope that he would receive a year-end bonus to repay his debts. (*Ibid.*) The trial court denied Paul's motion, finding no change in circumstances. (*Ibid.*)

The appellate court reversed and remanded to the trial court for redetermination of the motion to modify spousal support, directing the trial court to based the support obligations "on Paul's base salary, exclusive of a speculative bonus." (*In re Marriage of Mosley*, *supra*, 165 Cal.App.4th at p. 1387.) It concluded that Paul established a material change of circumstances by presenting evidence that (1) his net pay for the first two months of 2006 was less than the sums he paid in spousal support; (2) he borrowed to pay for his own living expenses; (3) although he received $85,000 in March 2006 as part of his 2005 bonus, most of the amount was used to pay off prior borrowings and the remainder covered two more months of his expenses before his being required to borrow again to pay for his living expenses; and (4) he anticipated he would need to borrow 100 percent of his living expenses for the last half of 2006. (*Id.* at pp. 1385-1386.)

The appellate court held the trial court abused its discretion: "[I]t exceeded the bounds of reason to require Paul to pay nearly 100 percent of his take-home pay in support payments, on the assumption, based on only a one-year history with the homebuilder, that he would continue to receive a six-figure bonus each subsequent year. It placed him in a position of having to borrow for his living expenses, and thus resulted in a miscarriage of justice." (*In re Marriage of Mosley*, *supra*, 165 Cal.App.4th at pp. 1386-1387; cf. *In re Marriage of Beust*, *supra*, 23 Cal.App.4th at p. 28 [denial of supported spouse's motion to extend duration of support based upon finding that there was no evidence she could not support herself was "erroneous," where uncontradicted evidence was that her income was insufficient to cover her living expenses].)

Here, Scott showed that his take-home pay was, at best, approximately $200 less than what was needed to satisfy the monthly support obligation of $7,828 due to the

19

extraordinary expenses he had incurred. But unlike Paul—who could point to the *possibility* of a discretionary year-end bonus that would permit him to pay for funds borrowed to pay his own living expenses—Scott had no such contingent resource. The trial court's failure to recognize Scott's current financial situation "placed him in a position of having to borrow for his living expenses" (*In re Marriage of Mosley*, *supra*, 165 Cal.App.4th at pp. 1386-1387) with nothing in the record to suggest he would be able to repay the borrowed money with additional income.

Cindy, both in her opposition below and on appeal, argues that Scott's purported premature and imprudent spending of the loan proceeds cannot furnish a basis for modification of the support order. She asserted below that from 2009 through 2012, Scott had at his disposal—combining the $980,096 in loan proceeds with his UBS draws and commissions—a total sum of $1,483,126. Cindy argued that had Scott been prudent in managing his money, there would be sufficient funds remaining, including loan proceeds, to be able to pay for the court-ordered spousal support. Scott responded to this assertion in a supplemental declaration, stating that in his 2013 motion, he had attached a spreadsheet accounting for the loan proceeds, and Cindy had not disputed any figures in his accounting.

We agree with Cindy in principle that a party moving to modify a spousal support order—either a supporting party or a supported party—may not through his or her intentional acts manufacture a change of circumstances. Thus, for instance, a supported spouse may not undertake additional debt beyond his or her reasonable means "to manufacture a change in circumstances" supporting modification of a spousal support order. (*In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 242, superseded by statute on another point as indicated in *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 882-883; see also *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902, 909-910 [termination of spousal support proper, among other reasons, because supported party's imprudent management of assets that resulted in

20

impairment of her financial status could not serve as basis for ongoing support].)  Thus, if the record demonstrated that Scott had manufactured the material change of circumstance—i.e., the exhaustion of the loan proceeds—through mismanagement or waste, the trial court might have been justified in rejecting that circumstance as a basis for modifying the spousal support order.

There is nothing in the record suggesting the court founded its denial of the 2013 motion on Cindy's contention that Scott was profligate in the management of the loan proceeds.  Further, we have reviewed the record in detail, and we are unable to concur that it supports Cindy's generalized claim that Scott mismanaged those funds.  Citing *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, Cindy argues that Scott cannot claim the exhaustion of the loan proceeds as a change of circumstances because "[a] supporting spouse does not have the right to divest himself of his earning ability at the expense of his wife and children."  But there is no evidence that Scott divested himself of his earning ability.  Instead, the record shows that the loan proceeds were exhausted due to extraordinary expenses incurred by Scott, including but not limited to $313,600 in litigation-related fees and costs, and a $110,000 property settlement to Cindy.  *In re Marriage of Ilas* is distinguishable.  There, the court was concerned with a husband and father, a pharmacist, who left his job to "fulfill[] a lifelong dream of attending medical school."  (*Id.* at p. 1635.)  The *Ilas* court rejected his position that the trial court could not consider his earning capacity to determine support unless it concluded that his actions had been a deliberate attempt to avoid support obligations by refusing to seek or obtain employment.  (*Id.* at p. 1638.)  Here, Scott never left his job at UBS.  Nor does the record show he took any other action to reduce his earnings.

Cindy contends that the exhaustion of the loan proceeds should not be considered a basis for modifying the support order because it was caused in part by Scott's having "spent over $400,000 on attorney's fees for himself and for [Cindy]."  (Original underscoring.)  The court, in its November 2010 statement of decision, observed that the

21

amount of fees incurred by the parties was "astronomical" and that "[t]here [was] no way to justify the exorbitant expenses incurred in this case." A different judge later concluded that Cindy's claim for $120,000 in attorney fees and costs to oppose the 2011 motion—a claim which was originally $30,000 when she filed her initial opposition to the motion—"was essentially undocumented." And, according to Scott's attorney, as of May 2013, Cindy had incurred more than $737,000 in attorney fees in the proceeding, or nearly triple the amount incurred by Scott. These fees are significant, and we see no basis to conclude they do not amount to a material change of circumstances.

Although the trial court's discretion in making a spousal support order or deciding a motion to modify a support order is broad, " 'it must exercise its discretion along legal lines taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities.' [Citation.]" (*In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 304.) The court does not have the discretion to ignore any of the statutory factors. (*Ibid.*) And the court, in deciding a spousal support modification motion, may not "base its finding on an assumption unsupported by the record. [Citation.]" (*In re Marriage of Hoffmeister*, *supra*, 191 Cal.App.3d at p. 360.)

Here, the court effectively ignored the statutory factor of "[t]he ability of the supporting party to pay spousal support, taking into account [his] earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).) This constituted an abuse of discretion. (*In re Marriage of Cheriton*, at p. 304.) The court's finding that Scott was "getting richer and richer"—from which it concluded that Scott had the ongoing ability to pay spousal support at the level ordered in November 2010—was an assumption unsupported by the record. (*In re Marriage of Hoffmeister*, at p. 360.) Accordingly, we will reverse the order denying the 2013 motion with directions to the trial court that it reconsider the motion by addressing and balancing each of the statutory factors in section 4320. In doing so, the court shall consider, among other things, Scott's

current ability to pay spousal support based upon his available assets and earnings, including the amount of his available monthly take-home income.

> ### D. The Attorney Fees Award

Scott argues that, assuming the order denying the 2013 motion does not withstand appellate scrutiny, the order awarding Cindy attorney fees of $10,000 should likewise be reversed and remanded for reconsideration by the trial court. He argues in the alternative that even if the order denying the 2013 motion is not reversed, the attorney fee order should be reversed because it "imposes an unreasonable financial hardship on him." Cindy responds that Scott waived his right to challenge the attorney fee award because he did not respond to or oppose it below. She also argues that substantial evidence supported the attorney fee award.

The record does not show that Scott specifically responded to Cindy's responsive declaration in which she asked the court to award her attorney fees of $20,000. But it is likewise true—as noted in Scott's reply brief—that Cindy, technically, may not have complied with the California Rules of Court in making her request for attorney fees. Since Scott did not seek attorney fees in the 2013 motion, Cindy, in seeking attorney fees, may have been required to file a separate request for attorney fees, rather than simply make the request in her responsive declaration. (See Cal. Rules of Court, rule 5.92(b); see also Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶¶ 5:373 to 5:374, p. 5-167 [responsive declaration "*cannot* be used to request affirmative relief on issues *not raised by the moving party*"].) Moreover, the trial court made the attorney fee award at the brief hearing immediately after denying the motion to modify and without indication that it sought argument on the attorney fee request. We will exercise our discretion to consider Scott's appellate challenge to the attorney fee award. (See *Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 367, fn. 34: "[A]ppellate courts enjoy broad discretion *not* to hold

an appellant to an implied waiver and may entertain an issue on appeal that might otherwise have been deemed waived by inaction or omission.")

It is common when an appellate court reverses a family court order, such as one involving spousal support or child support, that it will remand the matter, including an attendant attorney fee order, to the trial court for reconsideration. (See, e.g., *In re Marriage of Kochan* (2011) 193 Cal.App.4th 420, 431 [trial court should reconsider attorney fee order in light of reversal of spousal support order "because the attorneys' fee issue is also related to the parties' respective financial circumstances"]; *In re Marriage of Corman* (1997) 59 Cal.App.4th 1492, 1502 [because reversal and remand required reconsideration of child support issue, trial court should also reconsider attorney fee issue].) Here, because the trial court must reconsider Scott's motion to modify the spousal support order, and Cindy's attorney fee request is related to the parties' respective financial circumstances, we reverse the attorney fee award and remand the issue to the trial court.

## DISPOSITION

The June 24, 2013 order denying Scott Shepherd's motion to modify spousal support order and awarding Cindy Shepherd attorney fees of $10,000 is reversed. The matter is remanded to the trial court with directions that it, consistent with this opinion, reconsider the motion, in light of the existence of a change of circumstances justifying modification, giving appropriate consideration to all factors stated in Family Code section 4320. The parties shall bear his/her respective costs and attorney fees on appeal.

24

_____
                                    Márquez, J.


WE CONCUR:



_____
     Rushing, P.J.






_____
     Premo, J.






<u>In re Marriage of Shepherd</u>
No. H039876