Filed 4/29/21  Marriage of Miller CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re the Marriage of LAUREEN and STEPHEN ARMS MILLER. | D075425 |
| LAUREEN ANN MILLER, Appellant, v. STEPHEN ARMS MILLER, Appellant. | (Super. Ct. No. D547235) |


APPEALS from a judgment of the Superior Court of San Diego County, David Oberholtzer, Judge.  Affirmed in part, reversed in part.

Laureen A. Miller, in pro. per.; Higgs Fletcher & Mack, John Morris and Rachel E. Moffit for Appellant Laureen A. Miller.

Stephen Temko and Dennis Temko for Appellant Stephen A. Miller.


In this marriage dissolution proceeding, both wife Laureen A. Miller (Laureen) and husband Stephen A. Miller (Stephen) appeal from the final

dissolution judgment.[1]  Although the underlying facts and factual findings made by the trial court are largely undisputed, both parties contest portions of the court's division of property.

Over the course of a 29-year marriage, the couple acquired multiple investment properties and lived off the income produced by those properties. During a lengthy trial, the parties focused on the proper division of the properties and whether Stephen could trace his separate property investments in those real estate acquisitions.  The trial court found in Stephen's favor on many issues and ultimately found he retained substantial separate property interests, but also awarded Laureen a multi-million dollar equalizing payment.

Even with the complexity presented by this case, involving a multitude of properties owned by the spouses with commingled assets and a multi-million dollar marital estate, we conclude the trial court's division of the marital property should substantially be affirmed.  We find minor error only regarding the disposition of one retirement account and the trial court's structured payment schedule in the judgment for the equalizing payment due to Laureen.  For these reasons, we reverse and remand for minor modifications regarding these two issues, but otherwise affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Overview*

"Following established principles of appellate review, the facts are recited here in the light most favorable to the judgment."  (*In re Marriage of*

---

[1]    We refer to the parties by their first names for the sake of clarity and intend no disrespect.

*Hokanson* (1998) 68 Cal.App.4th 987, 990, fn. 1.) Additional facts will be discussed where relevant in the following section.

Laureen and Stephen married in 1984. Before the marriage, Stephen was self-employed as a real estate investor and owned interests in four income-generating properties, located on Fanuel Street, Commercial Street, Thomas Avenue, and La Jolla Boulevard.[2] Laureen was employed before marrying Stephen, but stopped working six months after marriage. The couple did not have a premarital agreement.

During the marriage, the couple had three children, all of whom were adults by the time of trial. Stephen continued his real estate investing while Laureen raised the children, maintained the household, and occasionally assisted Stephen with property management.

The parties lived almost entirely on the income received from the rental properties acquired before and after marriage. Those properties, along with other real property owned by the parties, were the focus of many of the disputes at trial and now on appeal.

*Real Property Acquired During Marriage*

In 1986, the Millers purchased land on Loring Street to build their family home. The parties purchased the property as joint tenants and did not dispute this property was community property.

In 1990, Stephen acquired a property on Tamarack Avenue in his name only using proceeds from the sale of his properties on Thomas Avenue and La Jolla Boulevard, combined with a loan secured with a deed of trust.[3]

_____

[2]  For the sake of simplicity, this opinion refers to the properties by their street name rather than the full address.

[3]  Stephen structured many of his real estate transactions in what is referred to as a "1031 exchange" for tax purposes. The precise mechanism for

3

In 1993, Stephen acquired a property on University Avenue in his name using a loan and, in part, the proceeds from the sale of his property on Commercial Street.

In 1995, Stephen acquired a 20-unit apartment building on Third Avenue. Both Stephen and Laureen were named on the title and there was no dispute at trial that the building was community property.

Stephen acquired another property in 2003 on Midway Drive. Title was held in Stephen's name only and the property was acquired in part with the proceeds from the sale of the Tamarack Avenue property.

In 2011, the Millers purchased a home in Long Beach (the Long Beach property), held jointly, which was to be used primarily as a residence for their adult son. Subsequently, their son paid for a 75 percent interest in the property such that by the time of trial, the Millers retained only a 25 percent interest in the property, which was agreed to be community property.

The next year, Stephen acquired a home on Wedeln Court in South Lake Tahoe. Stephen purchased the Wedeln Court property in his name only using cash.

Finally, in 2014, after Laureen and Stephen had separated, they purchased a home on Caminito Arriata to be used by Laureen as her residence. The property was purchased with cash and was held jointly by both Laureen and Stephen.

Seeking to modify the original deeds on the property, Stephen hired an attorney in 2012 to "update" and "modify" the Millers' estate plan. Both spouses were represented by the same attorney, retained by Stephen, and the

---

these exchanges is not relevant to the issues raised on appeal beyond the fact that some of the assets used to acquire property during marriage can be directly traced, in part, to Stephen's real property owned before marriage.

plan purported to transmute Laureen's community property interests in the Midway property, the Wedeln Court property, and in other bank accounts and assets to Stephen's separate property.

*Trial Court Proceedings and the Court's Statement of Decision*

In 2014, Laureen filed a petition for dissolution. At a trial focused primarily on tracing the funds used to purchase each property, the validity of the 2012 property agreement, and the current value of the properties, both Stephen and Laureen testified.

After the parties rested, the trial court made some preliminary findings and asked the experts to "re-crank" the numbers based on those findings. After additional filings and argument, both parties requested a statement of decision.[4]

In its final statement of decision, the trial court noted that it found Stephen to be "particularly credible" and Laureen to be "too scripted in her testimony." Turning to the major issues to be litigated, the court found that Stephen had failed to rebut the presumption of undue influence surrounding the 2012 property agreement that transmuted some of Laureen's community property interests and, accordingly, disregarded that agreement. The court further found that the loans received during marriage to acquire real property were community property, affecting the characterization of many of the properties.

Addressing the central issues on appeal, the court reconsidered two rulings it had made in its earlier proposed statement of decision. First, it found that because Stephen purchased the Midway and Wedeln Court

---

[4]   The parties filed their own proposed statements of decision, objections to those proposed statements, other motions, and objections to the court's own proposed statement of decision. Those filings will be discussed where relevant in the following section.

5

properties during marriage in his name alone, he was entitled to a pro rata separate property ownership interest in those properties to the extent they were purchased with his separate property. Second, the court found that Stephen did not breach his fiduciary duty to Laureen by using his separate property to partially fund those purchases because there is no "community opportunity doctrine" applied during marriage such that he had no duty to offer the investment opportunity to the marital estate before using his separate property.

Finding that Stephen adequately traced his use of separate property to partially fund the purchases, the trial court found that Stephen had a 64.73 percent separate property interest in the Midway property and a 44.19 percent separate property interest in the Wedeln Court property. For the Long Beach property, the court found that the Millers had a 25 percent community property interest, but because the Millers had agreed to allow their son to purchase their interest as calculated based on the original purchase price, the interest was only 25 percent of the equity in the property based on the lower purchase price rather than the appreciated current value. Regarding the other properties, the court found that they were all community property to be divided equally because Stephen either failed to trace his separate property contribution or the properties were purchased entirely with community property.

Based on these findings, the court divided the marital property, including requiring the sale of the Third Avenue property, and found Laureen was entitled to a gross equalizing payment of $2,145,056. The court also awarded Laureen permanent spousal support of $4,000 a month and

$275,000 in attorney fees.[5]  Recognizing that Stephen had limited cash liquidity, the court ordered that he was to pay Laureen a $1.8 million equalizing payment immediately with the remainder of the award to be paid off at "$100,000 per year, payable quarterly, to draw interest at the . . . 30-year Treasury Bond interest rate on January 2 of the year in which the payments are made."  The court subsequently entered a final judgment incorporating its rulings.

Both Laureen and Stephen appeal from the final judgment.

## DISCUSSION

I.    Laureen's Appeal

A.    *The "Community Opportunity Doctrine"*

Laureen does not challenge any of the trial court's factual findings tracing part of the Midway and Wedeln Court properties to Stephen's separate property.  Instead, Laureen contends that the trial court erred as a matter of law when it found that the "community opportunity doctrine" did not apply.  As framed by Laureen, the community opportunity doctrine would require either spouse to first offer an investment opportunity to the community before investing with separate property.  As applied here, Laureen contends that Stephen should have used community property to purchase the Midway and Wedeln Court properties rather than his separate property.  Laureen asserts that because Stephen failed to do so, he breached his fiduciary duty to Laureen, requiring a finding that Stephen forfeited his separate property interests in those properties.  We disagree.

---

[5]    The court had previously ordered Stephen to pay Laureen's attorney fees prior to trial.

7

Pursuant to Family Code section 721, subdivision (b),[6] "spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."

Although section 721 refers to certain sections of the Corporations Code to define the scope of the fiduciary duties owed between spouses, courts have specifically rejected that the *entire* Corporations Code is encompassed within the fiduciary duties owed under section 721. (*In re Marriage of Leni* (2006) 144 Cal.App.4th 1087, 1092-1094 (*Leni*).)

Here, Laureen does not contend that the entire Corporations Code is encompassed within section 721, but seeks to import at least some corporate law into the marital context. As Laureen correctly notes, there is a general doctrine of "*corporate* opportunity," which prohibits a corporate officer from taking advantage of an investment opportunity for herself that falls within the corporation's line of business activities. (See, e.g., *Industrial Indemnity Company, Ltd. v. Golden State Co.* (1953) 117 Cal.App.2d 519, 533; *Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 988.) However, Laureen fails to cite any decision applying the corporate opportunity doctrine in the marital context to create a community opportunity doctrine during the marriage. Instead, courts, including this court, have rejected its application.

In *In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461 (*Brandes*), this court considered a similar argument and found it unavailing. The trial court in *Brandes* found that the husband purchased shares in a company

---

6    All further statutory references are to the Family Code unless otherwise specified.

8

with his separate property during the marriage. (*Id.* at pp. 1481-1484.) On appeal, the wife argued that the husband "breached his fiduciary duty by not offering the community the opportunity to purchase the shares." We rejected that argument, relying on "relevant and instructive" existing case authority which held that a spouse should not be " 'compelled to keep his separate funds idle' " such that there is no breach of fiduciary duty by a spouse when " 'purchasing property with his separate funds, and not using available community funds.' " (*Id.* at pp. 1487-1488 & fn. 13, quoting *Somps v. Somps* (1967) 250 Cal.App.2d 328, 338.)[7]

In her reply brief, Laureen dismisses *Brandes* as "an extremely stark, sterile and antiseptic application" of what occurred here. She suggests that the principle applied in *Brandes* to shares in a business should not be applied here to real property. Laureen, however, offers no concrete reason to focus on this distinction without a difference. At most, she contends that because the separate property and community property interests here were commingled and Stephen lost at trial concerning some of his claims regarding property division, we should conclude that all of the property was community property. However, the trial court was able to trace Stephen's separate property contributions to community property and Laureen does not dispute those factual findings on appeal. To the extent she makes a general exception on appeal to the trial court's characterization of property without specific claims demonstrating any error, we deem the argument waived.

---

[7] The trial court relied upon *Leni*, *supra*, 144 Cal.App.4th 1087 to find that there is no community opportunity doctrine that applies during marriage. Although *Leni* does not involve the same situation present here, it does support the general proposition that not every fiduciary duty principle that applies to corporate officers can be applied wholesale in the marriage context. (*Id.* at p. 1092.) As Stephen admits on appeal, *Leni* is not directly applicable in this case.

We see no reason to depart from this court's prior reasoning in *Brandes* and hold that the corporate opportunity doctrine is not, and should not, be imported into the scope of the fiduciary duties owed by one spouse to the other during marriage. Stephen was not required to leave his separate property idle during the marriage. Thus, we conclude that the trial court correctly found that Stephen did not breach his fiduciary duty to the community by using his separate property to partially fund the acquisition of the Midway Drive and Wedeln Court properties.[8]

B.    *The Trial Court's Award of Pro Rata Separate Property Interests to Stephen*

Laureen next challenges the nature of the trial court's award to Stephen for his separate property contributions to the acquisition of the Midway and Wedeln Court properties. In a tentative decision, the trial court ruled that Stephen was entitled only to reimbursement for his contributions of his separate property to purchase those properties during the marriage. Stephen challenged this ruling and the court revised its ruling to ultimately conclude that because Stephen acquired the properties in his name alone, he was entitled to a pro rata ownership interest, not a right of reimbursement under section 2640. We conclude the trial court ultimately reached the correct conclusion.

As the trial court recognized, the analysis in *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411 (*Bonvino*) applies to the situation in this case. In *Bonvino*, the husband purchased real property with the deed held in his name alone. (*Id.* at p. 1419.) The purchase was made during the marriage

---

8    Because we conclude that the community opportunity doctrine does not apply here, we need not consider Stephen's alternative argument that even if it does apply, Laureen failed to establish each element necessary to its application.

10

and was funded with a down payment of the husband's separate property and a loan ultimately deemed to be community property. (*Id.* at pp. 1418-1420.) The trial court found the property to be community property with the husband having a right for reimbursement of his original contribution for the down payment. (*Id.* at pp. 1420-1421.) The appellate court disagreed, concluding that the trial court's finding that the property was community property was not supported by substantial evidence. (*Id.* at p. 1422.)

As the *Bonvino* court explained, " '[t]he character of property as separate or community is determined at the time of its acquisition. []' 'Property that a spouse acquired before the marriage is that spouse's separate property. Property that a spouse acquired during the marriage is community property unless it is (1) traceable to a separate property source, (2) acquired by gift or bequest, or (3) earned or accumulated while the spouses are living separate and apart.' " (*Bonvino, supra*, 241 Cal.App.4th at pp. 1422-1423 [internal citations omitted].) Additionally, property that a spouse purchases with separate property funds continues to be separate property, even if the spouse makes the purchase during the marriage. (*Id.* at p. 1423.) So long as the separate property can be traced, separate and community property can be commingled and that commingling does not alter the status of the separate property. (*Ibid.*) Spouses can agree to alter the character of their property (*id.* at p. 1424), but the Legislature established strict requirements to prove such a transmutation, requiring a written declaration " 'made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' " (*Id.* at p. 1428, quoting § 852, subd. (a).) "A married person may transmute the character of property from separate to community or from community to separate by agreement or transfer, with or without

11

consideration, but the transmutation must meet the statutory requirements to be valid." (*Bonvino*, at p. 1428.)

In *Bonvino*, the court noted that pursuant to section 2640, a spouse is entitled to reimbursement for separate property contributions to the acquisition of community property. (*Bonvino*, *supra*, 241 Cal.App.4th at pp. 1431-1432.) However, the court held that when a spouse uses both separate property and community property to purchase real property during marriage *but held in separate title*, the statutory requirements of section 852 for transmutations must be satisfied before the reimbursement provisions of section 2640 apply. (*Bonvino*, at p. 1432.) "By the plain language of the statute, section 2640 applies to contributions to the acquisition of community property. In other words, it applies to separate property contributions that are traceable from a community property asset at dissolution. Section 2640 does not purport to apply to separate property used during marriage to acquire an asset that retains its character as separate property. In order for section 2640 to apply, the asset purchased during marriage must be characterized as community property, and in order for separate property to become community property, the transmutation provisions must be satisfied." (*Id.* at p. 1433.)

The *Bonvino* court concluded that when the requirements of section 852 are *not* satisfied, the spouse who contributed separate property to acquire real property held in separate title during marriage retains a separate property pro rata interest in the property. (*Bonvino*, *supra*, 241 Cal.App.4th at pp. 1434-1435.)

Here, the trial court found—and Laureen does not dispute on appeal— that Stephen adequately traced his use of separate property to acquire the Midway Drive and Wedeln Court properties during marriage and, most

12

importantly, that he held those properties in separate title.  No evidence was presented regarding any writing meeting the transmutation requirements of section 852.  Accordingly, the trial court properly followed *Bonvino* to find that Stephen owned a separate property interest in both properties despite the use of a community property loan to partially fund the acquisitions.

On appeal, Laureen does not dispute the correctness of *Bonvino*'s analysis, but contends it does not apply here because the trial court found the properties to be community property.  However, as discussed *ante*, the trial court did *not* find that the properties were entirely community property, but rather that the properties were mixed assets, consisting of Stephen's separate property interest and a community property interest.  The existence of a partial community property interest, however, does not require application of section 2640's right of reimbursement when a mixed asset is held in separate title.

Laureen also attempts to distinguish *Bonvino* from the current circumstance by relying on several irrelevant factors that she deems "significant":  the difference in the length of marriages and the focus in *Bonvino* on a single property versus two properties here.  She also suggests that awarding Stephen a pro rata share is "simply unfair."  She fails, however, to suggest how any of these factors change the analysis outlined in *Bonvino* under the plain language of the applicable statutes.  Similarly, Laureen's characterization of the trial court as "reluctant" to apply *Bonvino* does not require us to decline to apply the law.  Laureen suggests the trial court was appealing to a "higher authority" to overrule *Bonvino*, but as the trial court recognized, any change in law must come from the Legislature, not this court.  Applying the current law, we conclude the trial court reached the correct result.

13

C. *Laureen's Request for an Accounting of Post-Separation Rental Income*

Next, Laureen contends the court erred in not ordering an accounting to ascertain the total amount of rental income generated from the income-generating properties between the date of separation and judgment to ensure it was equally distributed and to ensure Stephen did not fail to disclose all the assets held in various bank accounts. Laureen requested such an accounting, but the trial court concluded it was not necessary given an earlier interim spousal support order. When the entire history of the case is considered, we conclude Laureen fails to demonstrate any reversible error.

1. *Additional Background*

Following their separation in 2014, Stephen claimed that the income-producing real property along with bank accounts holding over $1 million were entirely his separate property. He retained control of the couple's bank accounts where rent was deposited.

Subsequently, Laureen requested an order *not* "for support in the traditional sense," but rather an order requiring an equal division of all rental income during the pendency of the proceeding. The trial court entered in interim order requiring Stephen to pay temporary spousal support of $20,000 and to provide an accounting of all income and monthly profit and loss statements for the Midway Drive and Third Avenue properties.

In an order entered in September 2015 following a hearing on Laureen's request for order, the trial court noted that Stephen was claiming the Midway Drive property as his separate property but conceded the Third Avenue property was community property. The court found that the Midway Drive property was generating approximately $35,000 per month and the Third Avenue property was generating approximately $18,000 per month in rental income. The court declined to determine the proper characterization

14

for each property at that early hearing, but ordered that Laureen was to receive one half of the rental income from the Third Avenue property plus $13,000 in spousal support. The court made the award retroactive and calculated Stephen owed Laureen a total of $124,000 in arrears. The court noted that Laureen "requested additional relief in her Request for Order, including financial disclosures and an accounting, but those issues are no longer in dispute."

Only months later, Laureen returned to court seeking sanctions and to modify the spousal support order. She declared that Stephen had unilaterally hired a third-party management company to manage the Third Avenue property, which had resulted in a reduction in rental income. In an order entered after a hearing in June 2016, the trial court agreed, sanctioned Stephen, and modified the spousal support order to require Stephen to pay Laureen a total of $22,000 per month in lieu of the earlier support order including an equal share of the Third Avenue property rental income.

As trial approached, Laureen asserted she was owed approximately $186,000 in "community income receivable" from the date of separation through September 2014, the month before she started to receive spousal support. She clarified that this was her equal share of the $46,646 in monthly rental income from the Third Avenue and Midway Drive properties. In her trial brief, she also claimed that the Third Avenue property was, at that time, generating about $18,000 per month and the Midway Drive property was generating about $37,000 per month.

In her request for statement of decision, Laureen asked the court to explain the basis for its denial of her request for an accounting on the post-separation rental income and request to "equally divide that rental income

15

with an offset to Stephen for the spousal support paid by Stephen." Laureen continued to receive $22,000 per month following trial.

After trial, at a hearing in April 2017, Laureen's counsel again asserted that an accounting was necessary. Her counsel pointed to a depletion in bank accounts controlled by Stephen as evidence of the need to account for post-separation rental income. In response, Stephen's counsel represented that Stephen had been spending money on maintaining the properties and that "a lot of the funds . . . have gone to Ms. Miller for court ordered fees, for back support." At the conclusion of the hearing, the court declined to order an accounting.

At another hearing in May 2017, Laureen again requested an accounting of the "community property rental income." The court indicated it intended to deny the request for an accounting and later stated it was "off the table" as an option. The court noted that the parties lived on the rental income "[a]nd to assume that the balance of that is in an account someplace and ought to be divided is a real stretch." Concerning the bank accounts controlled by Stephen, with approximately $1.1 million in deposits near the date of separation, the court found that $300,000 could be sourced to a deposit consisting of Stephen's separate property resulting from a sale of real property. The court also found Stephen was entitled to a credit for the approximately $200,000 in legal fees paid to Laureen, leaving $600,000 in deposits to be equally divided, resulting in a $300,000 payment to Laureen.

Laureen prepared a proposed statement of decision incorporating the court's rulings. Her proposed statement stated that "[t]he court finds that, as of a date closest to the date of separation, Stephen possessed financial accounts subject to division. Those accounts had a total value of $1,107,502. The Court finds that, after taking into consideration expenses paid by

16

Stephen post-separation—such as payment of his own legal fees, payment of his children's education expenses, and expenses related to the parties' Lake Tahoe Property—$600,000 of the total amount is subject to equal division." After the court's proposed statement of decision ruled that only $300,000 was subject to equal division, Laureen objected and reminded the court of its May 2017 ruling finding that Laureen was entitled to $300,000 out of the bank accounts, meaning that $600,000 was subject to equal division. The trial court responded to the objection by noting the amount subject to division was "corrected."

In its final statement of decision, the trial court divided the assets and ordered Stephen to make a net equalizing payment to Laureen of $2,063,056. The court declined Laureen's request for an accounting of the rental income of the Third Avenue property after the date of separation to ensure there was an equal division of the income. The court found that Laureen's receipt of $22,000 in monthly spousal support "more than compensated for her share of the Third Avenue rent."

2. *Analysis*

On appeal, Laureen contends the trial court failed to order an accounting to determine her share of the post-separation rental income and to determine how the funds in the bank accounts under Stephen's control "somehow disappeared . . . between the date of separation and the time of trial." In response, Stephen asserts the issue was forfeited, conceded, and is meritless.

Even assuming the issue was not forfeited or conceded, we agree that it has no merit. Pursuant to section 2550, a trial court must "divide the community estate of the parties equally." Although the value of the community property is adjudged at the time of trial, any earnings and

17

accumulations after the date of separation are the separate property of each spouse. (§§ 2552, subd. (a), 771, subd. (a).) On appeal, Laureen focuses on the community assets in this period between the date of separation and the date of trial.

As Laureen notes, each spouse has a fiduciary duty to account for community assets during the period between separation and final distribution. (See, e.g., *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1280.) Here, she claims that Stephen failed to account for the funds held in the bank accounts he controlled after their separation and the trial court's failure to order an accounting prevented a proper distribution of the post-separation rental income. Her claims, however, are undermined by the record.

Concerning the bank accounts, Laureen claims that funds somehow "disappeared" after separation. As she notes, the accounts held over $1.1 million shortly after separation, but were nearly depleted by the time of trial.[9]

The parties and the court, however, used the value of those bank accounts at the date nearest to separation in determining the proper division of assets. The court used the $1.1 million value of those bank accounts near

---

[9]     Laureen implies that Stephen improperly squandered or misappropriated these funds. Although the post-separation use of the funds is largely irrelevant, as we discuss *post*, the record suggests the funds were primarily used to pay the attorney fees and expert costs for both parties, along with paying taxes. The record does not support the implication that Stephen breached his fiduciary duties after separation by hiding assets or otherwise improperly disposing of community property.

the time of separation, with specific credits amounting to approximately $500,000, when dividing assets.[10]

Accordingly, although Stephen represented that the bank accounts held only $200,000 near the time of the trial, the court valued the bank accounts at $600,000, to be divided into equal shares of $300,000, in its statement of decision and judgment.  Given the trial court's focus on the bank account balances near the date of separation rather than the balance at the time of trial, Laureen fails to demonstrate how she was prejudiced by the trial court's refusal to order a detailed accounting of Stephen's use of those balances after separation.

Similarly, Laureen fails to demonstrate any need for an accounting of the post-separation rental income.  In March 2015, the trial court ordered Stephen to provide a detailed accounting of the rental income.  Stephen complied  and by September 2015, the court noted in an order that the issues regarding "financial disclosures and an accounting . . . are no longer in dispute."  Based on the information produced, the trial court was able to find that "Midway generates approximately $35,000 per month and Third Avenue generates approximately $18,000 per month."  By the time of trial, the rent on the Midway property had increased to $36,050 per month.

Following their separation, each spouse was entitled to their proportional share of the rental income.  (See, e.g., § 770, subd. (a)(3); *Hicks v. Hicks* (1962) 211 Cal.App.2d 144, 152-153; *In re Marriage of Mohler* (2020) 47 Cal.App.5th 788, 795 [explaining that post-separation rental income is divided between spouses in proportional shares].)  Here, there is no dispute that the Third Avenue property was community property, with each spouse entitled to an equal share of the post-separation rental income, or about

---

10      Laureen does not challenge the application of those credits on appeal.

$9,000 per month. In its statement of decision, the court found that the Midway Drive property was 35.27 percent community property and 64.73 percent Stephen's separate property. Thus, Laureen was entitled to only half of the proportional share of the community property interest, or 17.64 percent, of the Midway Drive property rental income. Assuming a monthly rent of $36,050 for the entire post-separation period, Laureen was entitled to $6,357.42 in monthly rental income.[11] Considering the Third Avenue and Midway Drive property rental income together, Laureen was entitled to, at most, $15,357.42 in post-separation monthly rental income. Although she requests an accounting, the record clearly establishes the basis for this amount and Laureen fails to establish how any additional information would have benefitted her in the final outcome at trial. If anything, more detailed information would *lower* this amount.

On appeal, Stephen contends that awarding Laureen one half of the rental income would be a "double dip" because she also received monthly spousal support. In reply, Laureen confirms that she has consistently conceded that any award of post-separation rental income must include a "monetary offset" to credit Stephen for his spousal support payments. As the trial court noted, Laureen's monthly support payment of $22,000 far exceeds her entitlement to slightly over $15,000 in monthly post-separation rental income. Thus, any credit arising from the payment of spousal support is more than enough to also compensate Laureen for the period between the date of separation and the first spousal support payment even if the amount

---

[11] The record reflects that the rent for the Midway Drive property increased during the period between separation and trial. Because it does not affect our analysis, we use the higher rate for our calculations given the record on appeal does not appear to include a month-by-month analysis of the rent.

of rental income received during that period wasn't awarded to Laureen via the division of the bank account balances. Accepting her concession that the support payments must be credited against her entitlement to post-separation rental income, Laureen effectively concedes that the trial court did not err in failing to order a more detailed accounting of the post-separation rental income or in reaching its final determination of the division of community property.

D. *The Structure for Satisfaction of the Equalizing Payment*

Laureen contends the court erred in structuring its final judgment to allow Stephen to make his equalizing payment periodically and at a low interest rate rather than making the payment due immediately and carrying the statutory rate of interest for money judgments. On this contention, we agree the trial court erred as a matter of law.

In its statement of decision, the trial court acceded to the requests of the parties and awarded three properties to Stephen and only one property to Laureen. Given this uneven division of real property, Stephen owed a gross equalizing payment of $2,145,056 to Laureen. Recognizing that Stephen did not have liquid assets to make the entire payment, the court ordered Stephen to make a lump sum payment from the proceeds of the sale of the Third Avenue property and then pay the remaining balance plus attorney fees in quarterly payments of $100,000, bearing interest at the "30-year Treasury Bond interest rate on January 2 of the year in which the payments are made." The judgment reflected the same payment schedule for the total outstanding balance owed of $538,056.

Laureen contends that the court's judgment was a money judgment, due immediately and bearing interest at the statutory rate of ten percent established by section 685.010 of the Code of Civil Procedure. In response,

21

Stephen asserts that Laureen forfeited the issue of quarterly payments by not raising it below and, alternatively, that the trial court did not abuse its discretion in structuring the payment in the final judgment.

As an initial matter, we reject Stephen's assertion that the issue is forfeited due to Laureen not raising the issue below. The issue is one that involves a pure question of law on undisputed facts. Accordingly, even assuming Laureen did not adequately raise the issue below, we can consider this matter of law for the first time on appeal. (See, e.g., *OCM Principal Opportunities Fund, L.P.* v. *CIBC World Markets Corp.* (2008) 168 Cal.App.4th 185, 195, fn. 8 [no forfeiture of issue regarding rate of interest on money judgment due to failure to raise issue in trial court].)

Marriage dissolution proceedings are generally governed by the same rules of practice and procedure as civil actions, as set forth in the Code of Civil Procedure. (Fam. Code, § 210.) Unless settled beforehand, the judgment of dissolution of marriage must also divide the community estate of the parties equally. (*Id*., § 2550.) Family Code section 155 acknowledges that the Code of Civil Procedure applies to judgments in family law proceedings and that *only* an initial support order shall be considered an "installment judgment," which is payable over time. For all other money judgments, interest commences to accrue on the date of entry. (Code Civ. Proc., § 685.020, subd. (a).) Pursuant to section 685.010, subdivision (a) of the Code of Civil Procedure, "[i]nterest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."

Nothing in the Code of Civil Procedure grants a trial court discretion to select a different interest rate or delay accrual of interest. To suggest otherwise, Stephen relies on authority involving the situation present here, where a trial court's award of community property to one spouse requires an

equalizing payment to the either spouse. As Stephen notes, these cases reveal that the court has broad discretion to divide assets equitably to achieve a net equal division. (See, e.g., *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 603.)

However, as Stephen also acknowledges, "[t]he asset distribution or cash out method involves distributing one or more community assets to one spouse and other community assets of equal value (*which may include an equalizing promissory note*) to the other." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88 [italics added].) Every case cited by Stephen regarding an equalizing payment due over a period of time involved the use of a secured promissory note. (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 761 [trial court ordered wife to execute promissory note secured by a second deed of trust on the family residence]; *In re Marriage of Slater* (1979) 100 Cal.App.3d 241, 244 [husband ordered to execute promissory note in favor of wife, secured by a pledge of the husband's one-half interest in partnership investments].) Although he quotes *In re Marriage of Stallcup* (1979) 97 Cal.App.3d 294, as supporting his claim that the trial court had discretion to determine the rate of interest, that decision is premised entirely on *In re Marriage of Tammen* (1976) 63 Cal.App.3d 927, which involved the use of a secured promissory note to effectuate an equal division of property. (*Id.* at pp. 929-931.)

These decisions establish that when a trial court exercises its discretion under section 2601 to award an asset to one spouse and the other spouse cannot receive an equal share of community property by receiving other assets, the court may either order an equalizing payment *or* order execution of a secured promissory note to allow payment over time at a reasonable interest rate selected by the trial court.

23

Here, the trial court did not order Stephen to execute a secured promissory note, but rather simply included an equalizing payment in the final judgment. In *In re Marriage of Pollard* (1988) 204 Cal.App.3d 1380, this court considered a similar situation and held that "part of a judgment of dissolution which awards money in lieu of an in-kind division of nonmonetary community property is a money judgment on which interest accrues from the date of its entry, in the absence of an express or implied agreement by the parties to the contrary." (*Id.* at p. 1382.) More recently, the Second District reached a similar result in *In re Marriage of Dalgleish & Selvaggio* (2017) 17 Cal.App.5th 1172, concluding that an equalizing payment in a dissolution judgment is a money judgment with interest commencing to accrue upon the date of entry of the judgment. (*Id.* at pp. 1177-1180.) The Second District further held that the trial court had no discretion to adopt a different date for the accrual of interest. (*Id.* at p. 1182.)

Without the execution of a promissory note, the trial court had no discretion to sidestep the statutory requirements for money judgments. By ordering Stephen to make an equalizing payment, the judgment was a money judgment on which interest began to accrue immediately at the statutory rate. By ordering otherwise, the trial court erred, warranting a reversal to modify the judgment in this regard.

E.      *Valuation of the Community Interest in the Long Beach Property*

Next, Laureen challenges the trial court's handling of the Long Beach property, arguing she was entitled to a larger equalizing payment arising from her interest in the property. We disagree.

1.      *Additional Background*

The evidence at trial established that the parties purchased the Long Beach property to use as a residence for their adult son. The property was

24

purchased in 2011 for $752,000, financed with a $488,800 loan. Laureen testified that their son was making all of the loan payments and would continue to do so. Stephen testified at trial that the loan had been paid down to an amount slightly less than $460,000, later specified to be $455,000. Stephen testified that the agreement with their son was that "he could buy us out at what we paid." By the time of trial, their son had acquired a 75 percent interest in the property, leaving the parties with a 25 percent interest. It was undisputed that the 25 percent interest was community property and that the property had an appraised market value of $1,100,000 by the time of trial.

At trial, Laureen asserted she was entitled to an equal share of 25 percent of the current appraised value, or $275,000. The trial court disagreed, instead finding that based on the agreement with their son, the value of the parties' interest was based on the original purchase price, not the current appraised value. Recognizing an outstanding loan balance of $455,000, the court calculated the total equity in the Long Beach property, based on the original purchase price of $752,000, to be $297,000, of which 25 percent belonged to the parties. Accordingly, the court determined that the entire community property interest totaled $74,250, which was assigned to Stephen with an equalizing payment due to Laureen.

2. *Analysis*

On appeal, Laureen contends "[t]here was no evidence at trial to support the trial court's conclusion . . . that Stephen and Laureen had an agreement that the community's interest in the Long Beach Property was equal to only 25% of the equity at the time of purchase." However, she also admits that Stephen directly testified that the agreement was that their son would "buy us out at what we paid."

25

Seeking to push aside this evidence, Laureen suggests Stephen's testimony should be regarded with "skepticism" and points to the absence of evidence regarding an express agreement between Stephen and Laureen in this regard. This assertion, however, runs counter to well-established principles of appellate review under the substantial evidence standard of review.[12]

"On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence." (*In re Marriage of Hokanson, supra*, 68 Cal.App.4th at p. 994.) " ' " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750.)

Here, the trial court found Stephen to be "particularly credible." We cannot, and will not, reverse the trial court's judgment simply because Laureen believes Stephen to be so contemptible that the entirety of his testimony should be disbelieved. "Ad hominem arguments, of course,

_____

[12] Laureen does not directly address the standard of review, but asserts that "no substantial evidence" supports the trial court's findings. As Stephen discusses in his brief, and Laureen does not dispute in her reply brief, we apply the substantial evidence standard of review to the trial court's findings. (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.)

constitute one of the most common errors in logic: Trying to win an argument by calling your opponent names . . . only shows the paucity of your own reasoning." (*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1430.)

Following the lead of the trial court, we accept Stephen's credibility and conclude his testimony supports the court's determination of the value of the parties' interest in the Long Beach property. At the time they purchased the property for $752,000, the parties had an outstanding mortgage of $488,800. They subsequently sold a 75 percent interest in the property to their son and agreed that their son could purchase their remaining interest over time "at what we paid." By the time of trial, the mortgage had been paid down to $455,000, creating a total equity interest of $297,000 based on the original purchase price. Using these figures, the court found that the 25 percent community property interest in the total equity interest of $297,000 equaled $74,250. Laureen's equal share of this community property interest was $37,125. This value, based on the original sales price due to Stephen's testimony regarding the agreement with their son, is supported by substantial evidence.[13]

---

[13] Some of the confusion regarding the precise value of the community interest in the Long Beach property arises from what appears to be an accounting discrepancy: there is no dispute that the parties purchased the property for $752,000, but the record suggests the purchase was accomplished with a $488,800 mortgage and a $324,052 down payment, which would total $812,852. The parties do not explain this discrepancy. If anything, the trial court overvalued the 25 percent community interest: accepting the original mortgage amount of $488,800, the total equity in the property was $263,200, leading to the parties' 25 percent interest totaling only $65,800 rather than $74,250. Although the equity interest had grown as the mortgage had been paid down, Laureen testified that their son was paying the mortgage such that any increase in equity should be attributed to

F.      *Stephen's Alleged Breaches of Fiduciary Duty*

In her final argument, Laureen asserts the trial court erred in not finding that Stephen breached his fiduciary duties owed to Laureen. She asserts that "[t]he conclusion is inescapable that Stephen repeatedly, intentionally, and maliciously breached his fiduciary duties to Laureen, and consequences for those breaches should have been imposed, under [] section 1101, subdivision (g) . . . or, more appropriately, under [s]ection 1101, subdivision (h)." She points to what she deems to be "overwhelming and undeniable" evidence to support her assertion.

However, as Stephen notes, Laureen fails to establish that she requested such broad relief in the trial court or that the court made the findings regarding a breach of fiduciary duty implied by her argument on appeal. Instead, the record establishes that the issue of breach of fiduciary duty was limited to two narrow issues.

First, Laureen asserted that if the trial court found any separate property interest in the Midway or Wedeln Court properties, the court must find that Stephen breached his fiduciary duties by failing to offer the community estate an opportunity to invest in those properties. As discussed *ante*, we conclude the trial court properly determined that the community opportunity doctrine does not exist in this context. Accordingly, Laureen fails to establish a breach of a nonexistent duty.

Second, after trial, Laureen asserted that Stephen breached his fiduciary duties relating to some gold coins owned by the parties. Before trial, Stephen represented that the parties owned 200 gold coins, which the court ruled were community property to be divided equally. Following trial,

_____

him. Regardless, any valuation error in this regard would benefit Stephen, *not* Laureen, and Stephen does not raise this issue on appeal.

the court indicated that each spouse should receive 100 coins, but Stephen's counsel replied that although Stephen agreed to divide the coins equally, his pre-trial representation that he possessed 200 coins was just a "best estimate." Claiming he was dividing the coins in his possession equally, Stephen gave Laureen 90 coins altogether: 10 of the coins shortly after she filed for divorce and another 80 coins after trial.

Believing she was entitled to more coins, Laureen subsequently filed a request for order with additional evidence regarding the true number of gold coins. After two additional evidentiary hearings, the court ultimately determined that the parties owned 222 gold coins it total, but acknowledged that Stephen had sold 20 coins and placed the proceeds in a bank account. The court's final judgment ordered Stephen to make an additional equalizing payment of $21,840 to compensate for the missing coins.[14] To reach this total amount, the court ordered Stephen to make an equalizing payment based on the value of 11 coins. Regarding the 20 coins that were sold, the court accepted Stephen's representation that he ultimately invested the proceeds in the Wedeln Court property—which was determined to be partially community property and that Laureen therefore benefitted from the investment in that property—but still found that Laureen was entitled to a credit for five additional coins. Finding no malfeasance, the court denied Laureen's request for attorney fees and costs.

Laureen contends the court erred in not finding that Stephen concealed the gold coins and therefore breached his fiduciary duties. As discussed *ante*, section 721 imposes fiduciary duties on spouses "of the highest good faith and fair dealing." (*Id*. at subd. (b).) Section 1100 further defines the scope of the

---

14    At a hearing, the parties consented to the court's valuation of the gold coins at $1,356 each.

duties owed by one spouse to the other, including "to act as a fiduciary toward the other in the management of community assets 'in accordance with the general rules governing fiduciary relationships . . . as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . .' " (*In re Marriage of Prentis-Margulis & Margulis*, *supra*, 198 Cal.App.4th at pp. 1269-1270, quoting § 1100, subd. (e).)

Section 1101 in turn creates a right of action and specific remedies for breach of the fiduciary duty between spouses "for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate[.]" (*Id.* at subd. (a).) Under subdivision (g) of section 1101, one spouse may be awarded "50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." Under subdivision (h) of section 1101, if the breach falls within the "ambit of Section 3294 of the Civil Code," the spouse is entitled to an award of "100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty."

Here, Laureen claims she is entitled to an award under section 1101, subdivision (h). Such an award, however, requires a showing that the alleged breach falls within the "ambit" of Civil Code section 3294, which requires a showing that Stephen is "guilty of oppression, fraud, or malice." (*Id.* at subd. (a).) The trial court, however, found that Stephen "was testifying to the best of his ability" and while he was "misinformed" about the true number of

30

coins, the court did not believe he was trying to mislead the court. The court "conceded" that there was no malice regarding Stephen's representations regarding the coins. Finding Stephen's representations regarding the coins to be "a matter of omission, not commission," the court declined Laureen's request to find a breach of fiduciary duty warranting additional relief. Although Laureen contends otherwise, she offers no evidence supporting a finding under Civil Code section 3294.

Laureen further contends that "the trial court's finding that Stephen's deceptive conduct [regarding the gold coins] did not constitute a breach of his fiduciary duties is not supported by the evidence." As the trial court found, Stephen openly testified regarding his recollection of the gold coins and we will not second guess the trial court's credibility determination. At most, Laureen faults Stephen with gifting a single gold coin in his possession to a "lady friend" after their separation. While Laureen characterizes this as an "insult" to her given the romantic insinuation, it is not sufficient to prove a breach of fiduciary duty warranting additional relief under section 1101, subdivisions (g) or (h). Although the court found Stephen inadvertently omitted some of the gold coins in his asset disclosures, Laureen's right to her equitable share of the value of the coins was not impaired by Stephen's innocent misstatements. We see no error in the trial court's finding that Stephen did not breach his fiduciary duties regarding the gold coins.

On appeal, Laureen also contends that Stephen breached his fiduciary duty in relation to other property and in the handling of the parties' finances and records. However, the record is devoid of any mention of a breach of fiduciary duty in relation to these issues. Beyond the issue relating to the community opportunity doctrine, her mandatory trial statement and trial brief did not include the issue of breach of fiduciary duty as an issue to be

31

resolved at trial. Likewise, her request for statement of decision focused only on a theory of breach of fiduciary duty centered on the community opportunity doctrine.

To the extent Laureen is now attempting to expand her claims to cover additional grounds for finding a breach of fiduciary duty, those claims should have been raised in the trial court and cannot be raised for the first time on appeal. " ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried . . . . [I]t would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." ' " (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695.) Accordingly, we will not address Laureen's request that we reverse the trial court's judgment on a basis not raised in that court. Thus, Laureen fails to demonstrate any reversible error regarding her assertions arising from a claim of breach of fiduciary duty.

II.    Stephen's Appeal

Stephen filed his own cross-appeal challenging portions of the judgment. One of his arguments is conditioned on a finding of error regarding the property distribution to Laureen. Because we find no error, as discussed *ante,* we need not consider that argument. We consider his other arguments in turn.

A.    *The Court's Disposition of Jewelry*

Stephen first contends that there was insufficient evidence to support the trial court's conclusion regarding the disposition of jewelry owned by the parties. He contends the trial court erred in failing to determine the value of

the jewelry and neglecting to require Laureen to present evidence that it was a gift given to her by Stephen. We see no error.

1. *Additional Background*

In his initial asset disclosure, Stephen recognized the parties owned jewelry of unknown value, which Stephen represented was all in Laureen's possession. Laureen valued the jewelry at $50,000 and did not claim a separate property interest. In her mandatory trial statement, Laureen asserted that the jewelry should be distributed to allow each spouse to retain the jewelry in their possession. The trial court's proposed statement of decision adopted Laureen's disposition of the jewelry, but Laureen objected by noting the trial court indicated during trial that the disposition of the jewelry and other personal property was to be referred to a special master. In its final statement of disposition, the trial court noted that the disposition of the jewelry had been referred to the special master.

The special master's report was focused on the personal property in each residence, but also discussed the jewelry. The special master reported that he lacked the expertise to value the jewelry and explained that if any party intended the jewelry to be treated as anything other than gifts deemed to be separate property under section 852, the special master would be available to assist in such a valuation. The record does not include any indication that either party responded to the special master's invitation. In its judgment, the court referred to the special master report and ruled that "[a]ll jewelry in the possession of each party are assigned to that party as their separate party. []§ 852(c)."

2. *Analysis*

On appeal, Stephen now contends there was insufficient evidence to support the trial court's judgment awarding each spouse the jewelry in their

33

possession pursuant to section 852, subdivision (c). That section provides that although a transmutation of property must be made in writing with specific requirements, that rule "does not apply to a gift between the spouses of clothing, wearing apparel, jewelry, or other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made and that is not substantial in value taking into account the circumstances of the marriage."

By finding that section 852, subdivision (c) applied, the trial court impliedly found that Stephen gave the jewelry as a gift to Laureen and that the jewelry was not "substantial in value taking into account the circumstances of the marriage."[15] (*Ibid.*) Stephen contends there was no evidence at trial regarding whether a gift had been made, but he expressly testified that he "bought substantial jewelry for Mrs. Miller." Based on this representation, the trial court could determine that he gifted the personal jewelry to Laureen. (See, e.g., *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness may constitute substantial evidence to support the trial court's factual findings].)

Stephen relies on *In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449 (*Steinberger*) to support his contention that section 852, subdivision (c) does not apply to the gift of jewelry, but that case is inapposite. In *Steinberger*, the trial court concluded the husband gave a ring to his wife as a gift, but also found the ring was substantial in value. (*Id.* at p. 1456.) Thus, on appeal, the court concluded that section 852, subdivision (c) did not apply because the ring was of substantial value. (*Id.* at p. 1466.)

---

15    Neither party requested a statement of decision on the issue of the jewelry and, accordingly, the court made no express findings in this regard.

34

Here, on the other hand, the trial court made no express finding regarding whether the jewelry was "substantial" in value. Laureen represented in her asset disclosure statement that the jewelry was worth $50,000, which would equate to gifts of less than $2,000 for every year of the marriage. Altogether, the jewelry was worth less than one percent of the entire marital estate. Stephen did not offer opposing evidence and did not take advantage of the special master's offer to obtain a valuation "[i]f counsel or the parties are seeking evaluation of individual items as to whether they should be treated differently than [section] 852 property." On this record, the trial court did not err in determining the jewelry in Laureen's possession was her separate property under section 852, subdivision (c).

B. *The Judgment Regarding Laureen's IRA Account*

Next, Stephen contends the trial court's judgment is ambiguous regarding the disposition of an "IRA" account. The judgment suggests that the retirement account was Laureen's separate property, but also ordered that it be divided by the time rule. We agree with Stephen that the judgment must be clarified.

Before trial, Stephen identified an "IRA," or individual retirement account, with a balance of $38,500 among the marital assets. During trial, Laureen testified that it was her IRA and that she contributed to the account both before and during marriage. At the end of trial, the court found that there was no testimony regarding the timing of the contributions and ruled that it would be divided "according to the time rule."[16] In its statement of

---

[16] Under the "time rule," "the community interest in the retirement benefits is determined 'to be that fraction of retirement assets, the numerator of which represents the length of service during the marriage but before the separation, and the denominator of which represents the total length of

decision, the court found the account had a value of $22,604 and again stated it would be divided by the "time rule."

By the time of judgment, however, the court made two irreconcilable rulings regarding the IRA account. The court again ruled that the account would be divided by the "time rule," but also stated in the same judgment that the "Fidelity IRA account 5606 is assigned to Laureen as her sole and separate property."

As Stephen suggests, the judgment is ambiguous as to the proper disposition of the IRA account. The court ruled both that it should be divided between the spouses, based on Laureen's testimony that she contributed to the account during marriage, but also that the account was entirely Laureen's separate property. Additionally, the disposition of that account may affect the amount of the equalizing payment. On remand, the court must make a clear ruling on the proper disposition of the IRA account and, if necessary, adjust its judgment accordingly.

C.    *Stephen's Request for a "*West *Warning"*

Finally, Stephen contends the court neglected to give a "*West* warning" to Laureen, in reference to *In re Marriage of West* (2007) 152 Cal.App.4th 240 (*West*). As Stephen explains, he requested that the court inform the parties that they must "manage the assets they received in the division of property wisely to accomplish self-support." Although Stephen asked for a "*West* warning," and the court suggested it would include such a warning, the court did not reference *West* in its statement of decision or judgment. Although Stephen asserts this omission constitutes reversible error, he does not explain how the court's judgment was insufficient. Our review of the

---

service by the employee-spouse.' " (*In re Marriage of Bowen* (2001) 91 Cal.App.4th 1291, 1295.)

statement of decision and judgment leads us to conclude that it substantially fulfills the purpose of a "*West* warning" such that reversal is not warranted.

Stephen's request arises from the decision in *West*. As part of a marital settlement agreement, the parties agreed to a significant equalizing payment and the wife was awarded spousal support with the expectation that she would make a reasonable good faith effort to become self-supporting. (*West*, *supra*, 152 Cal.App.4th at pp. 242-243.) Years later, the husband requested an order to reduce the spousal support, based in part of the wife's failure to make a reasonable good faith effort to become self-supporting. (*Id.* at pp. 243-244.) The trial court agreed and reduced support after finding the wife did not adequately exercise her ability to prudently invest the equalizing payment. (*Id.* at p. 246.)

On appeal, the court in *West* held the trial court could not penalize the wife for failing to invest her share of the marital property "without first warning her that she would be expected to invest it." (*West*, *supra*, 152 Cal.App.4th at p. 251.) The court concluded that the wife's receipt of "a substantial cash asset upon termination of the marriage provides no grounds for later reducing support, and even if it did, it would be an abuse of discretion to penalize her for failing to invest that asset without providing her with fair warning of the court's expectations." (*Ibid.*) However, the court implied that no such warning was necessary to deny a spouse's request to *increase* support based on the disposition of income-earning property. (*Id.* at p. 250.)

Here, the trial court awarded Laureen permanent spousal support of $4,000 per month. Laureen was also awarded a gross equalizing payment of $2,145,056 and Stephen asked the court to warn her that "any decrease[d] income whether because (1) the rate of return on the sale proceeds is less or

37

(2) she loses the sale proceeds because of unwise investments, this loss will not be a ground to return to court and seek spousal support." At a subsequent hearing, Stephen's counsel explained he was seeking a "*West* warning" "so that . . . that spouse does not come back into Court months later after they spent all their liquid funds asking for another contribution from the payor spouse."

Stephen's concern that Laureen would return to court seeking an *increase* in spousal support based on a failure to reasonably invest her capital is different than the situation present in *West*, where the court held that a trial court may not order a *reduction* in spousal support based on a failure to invest without first warning the spouse she was expected to invest. Nothing in *West* supports Stephen's assertion that a warning was necessary to preclude a denial of a potential future request to increase spousal support. Instead, as the *West* court noted, "a party cannot dispose of income-earning property and expect the supporting spouse to make up the difference." (*West, supra*, 152 Cal.App.4th at p. 250.)

Regardless, the trial court's order *did* inform Laureen that she was expected to invest her post-dissolution share of the marital property. In the statement of decision, the trial court based its spousal support calculation on, in part, its conclusion that "Laureen is capable of managing her assets and providing earnings for herself." The court assumed a "prudent" rate of return and set the award of spousal support on the court's expectation that Laureen would, and could, invest her share of the marital property. Although the court did not specifically reference *West*, the court's statement of decision adequately conveyed the court's expectation that she would invest her equalizing payment. This statement substantially fulfilled the purpose of Stephen's requested "*West* warning" and put Laureen on notice that she could

38

not imprudently squander her share of the marital property and then return to court seeking an increase in spousal support without an adequate explanation.  We see no reason to reverse the judgment to direct the trial court to add a citation to *West* to its statement of decision or judgment that adequately conveyed the expectation that Laureen would prudently invest her share of the marital property.

DISPOSITION

The judgment is reversed as it relates to the equalizing payment schedule, the trial court's selected non-statutory interest rate, and regarding Laureen's IRA account.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


O'ROURKE, J.


39